709 N.W.2d 567 (2006)
474 Mich. 1027
Daniel ADAIR, et al., Plaintiffs-Appellants,
v.
STATE of Michigan, DEPARTMENT OF EDUCATION, Department of Management and Budget, and Treasurer of the State of Michigan, Defendants-Appellees.
No. 129467.
Supreme Court of Michigan.
January 31, 2006.
*569 TAYLOR, C.J., and MARKMAN, J. state as follows:
Plaintiffs have moved for our recusal from participation in this case on the basis of our spouses' employment with the office of the Attorney General and the "appearance of impropriety" assertedly raised by such employment.[1]
*570 Having carefully considered this motion, we deny the motion for the following reasons:[2]
(1) The asserted basis for recusal in this case, the employment of our spouses by the Attorney General's office, has never *571 before been understood in Michigan to constitute a basis for recusal.
(2) Specific court rules in Michigan that permit us to participate in this case are fully consistent with the rules and practices of the United States Supreme Court, the federal judiciary, and virtually every other state of the Union.
(3) Where, as here, specific court rules address the asserted basis for recusal, and those rules make clear that recusal is not required, a vague allegation of an "appearance of impropriety" cannot prevail over those rules.
(4) It would be an ethical "snare" if judges who complied fully with court rules, as well as with other rules of law such as those pertaining to campaign contributions, were subsequently required to recuse themselves from cases despite their compliance with the rules and laws.
(5) The recusal policy asserted by plaintiffsthat no judge can hear any case in which a party is represented by a law firm or a prosecutor's office in which a relative of that judge is employed, even if that relative has no personal involvement in the case and stands to gain nothing materially by its outcomeconstitutes an unfair and unwise policy that would seriously inhibit employment opportunities for any judge's spouse or relative who is an attorney.[3]
(6) Moreover, the "exception" that plaintiffs would allow to this rulethat a judge may hear a case only if all attorneys agreed to permit his or her participationwould politicize and introduce gamesmanship into the judicial process.
(7) While the rule proposed by plaintiffs is unwarranted even with regard to spouses and relatives who are employed by private law firms, it is even more draconian with regard to spouses and relatives who are employed by prosecutor's offices whose financial viability is unaffected by whether they prevail in a given lawsuit and in which employee compensation is similarly unaffected.
(8) Particularly on the supreme court of a state, a body in which judges who recuse themselves cannot be replaced, it is necessary that judges participate in cases in which recusal is not required.
(9) If the fact of a working spouse or relative is viewed by some as sufficient to cast an "appearance of impropriety" on a judge's work, despite court rules and historical practice to the contrary, and despite a history of honorable conduct on the part of such judges in recusing themselves from cases in which their spouses were genuinely involved or interested, such a judgment must come from the people in the course of the judicial selection process provided for by the Michigan Constitution.

1. MCR 2.003(B)(6)
MCR 2.003(B)(6) states that, with regard to a "judge's spouse, or a person within the third degree of relationship to either [the judge or the judge's spouse], or the spouse of such a person," a judge is disqualified where that relative:

*572 (a) is a party to the proceeding, or an officer, director or trustee of a party;
(b) is acting as a lawyer in the proceeding;[4]
(c) is known by the judge to have more than a de minimis interest that could be substantially affected by the proceeding;[5] [or]
(d) is to the judge's knowledge likely to be a material witness in the proceeding.
None of these circumstances obtains in the instant case with regard to our spouses.

2. UNITED STATES SUPREME COURT POLICY
MCR 2.003(B)(6) is consistent with the policy of the United States Supreme Court, which requires recusal in cases in which, with regard to a justice's spouse, or a person within the third degree of relationship to either the justice or the justice's spouse, or the spouse of such a person, "the litigation is in effect `his' or `her' [i.e., the relative's] case"; in which "the amount of the relative's compensation could be substantially affected by the outcome"; or in which "appearances on behalf of parties are made by firms in which our relatives are partners, unless we have received from the firm written assurance that income from Supreme Court litigation is, on a permanent basis, excluded from our relatives' partnership shares."[6] Again, none of these circumstances obtains in the instant case with regard to our spouses.

3. ABA MODEL CODE OF JUDICIAL CONDUCT
MCR 2.003(B)(6) is consistent with the American Bar Association Model Code of Judicial Conduct, Canon 3, which requires recusal in any proceeding in which the judge's *573 spouse, or a person within the third degree of relationship to either [the judge or the judge's spouse], or the spouse of such a person:
(i) is a party to the proceeding, or an officer, director, or trustee of a party;
(ii) is acting as a lawyer in the proceeding;
(iii) is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; [or]
(iv) is to the judge's knowledge likely to be a material witness in the proceeding.
Once more, none of these circumstances obtains in the instant case with regard to our spouses.

4. FEDERAL LAW
MCR 2.003(B)(6) is consistent with the federal recusal statute, 28 USC 455(b)(5), which provides that a federal judge shall recuse himself from any proceeding in which
[h]e or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
(i) Is a party to the proceeding, or an officer, director, or trustee of a party;
(ii) Is acting as a lawyer in the proceeding;
(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
(iv) Is to the judge's knowledge likely to be a material witness in the proceeding.[[7]]
Again, none of these circumstances obtains in the instant case with regard to our spouses.

5. STATE LAW
MCR 2.003(B)(6) is consistent with the judicial conduct rules of Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wyoming,[8] all of which define the obligation to recuse in terms of whether a relative: (i) is a party *574 to the proceeding, or an officer, director, or trustee of a party; (ii) is acting as a lawyer in the proceeding; (iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding; or (iv) is to the judge's knowledge likely to be a material witness in the proceeding.[9]
46 Am. Jur. 2d, Judges, § 140, pp. 237-238, provides a helpful summary of state law in this area:
The canons rules of virtually all states provide that a judge should disqualify himself if he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding. The question of whether a person within the required relationship to either the judge or his spouse, or the spouse of such person, is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding as in the case where the judge's relative is affiliated with a law firm representing one of the parties, depends on the particular facts of each case. The court may consider: (1) the nature of the attorney's interest in the law firm; (2) whether that interest could be affected by the outcome of the case, and if so, whether it could be substantially affected; and (3) the judge's knowledge regarding the attorney's interest in the firm. One primary concern is the financial remuneration which the judge's relative might receive. Closely related to direct financial remuneration are nonpecuniary benefits to the lawyer-relative's firm, such as enhanced reputation and increased good will that indirectly benefit the lawyer-relative. The fact that a lawyer in a proceeding is affiliated with the law firm with which a lawyer-relative of the judge is affiliated does not of itself disqualify the judge, nor does the possibility of a large verdict returned in the case. However, courts hold that judges must disqualify themselves from presiding over a case if one or more of the lawyers on the case belongs to a law firm in which the judge's relative of the requisite degree of relationship is a partner.[[10]]

*575 6. CASE LAW
MCR 2.003(B)(6) is consistent with relevant judicial decisions on the subject of the instant motion. See 73 A.L.R. Fed. 879; 54 A.L.R. Fed. 855; State v. Harrell, 199 Wis.2d 654, 546 N.W.2d 115 (1996) (disqualification not required where judge's wife was an assistant district attorney in the county district attorney's office that was prosecuting the defendant); Sensley v. Albritton, 385 F.3d 591 (C.A.5, 2004) (disqualification not required where judge's wife was employed as a state assistant district attorney in the office that was representing the defendants); Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc., 851 So.2d 466, 498 (Ala., 2002) (statement of Lyons, J.) (disqualification not required where judge's son was an associate with the law firm that represented one of the parties); Archer Daniels Midland Co. v. Seven Up Bottling Co., 746 So.2d 966, 990 (Ala., 1999) (statement of See, J.) (disqualification not required where judge's brother-in-law was a partner in the law firm that represented one of the parties); Adams v. Deaton, Inc., 644 So.2d 189 (La., 1994) (disqualification not required where judge's son was an associate with the law firm that represented one of the parties); Brown v. Fed. S. & L. Ins. Corp., 105 Nev. 409, 777 P.2d 361 (1989) (disqualification not required where judge's daughter was a law clerk with the law firm that represented one of the parties); Keene Corp. v. Rogers, 863 S.W.2d 168 (Tex.App., 1993) (disqualification not required where judge's son-in-law was an associate with the law firm that represented one of the parties); State v. Putnam, 164 Vt. 558, 675 A.2d 422 (1996) (disqualification not required where judge's husband was a police officer who worked in the same barracks as an officer who was a potential witness in the case); IQ Products Co. v. Pennzoil Products Co., 305 F.3d 368 (C.A.5, 2002) (disqualification not required where judge's father-in-law was a retired partner in the law firm that represented one of the parties); Southwestern Bell Tel. Co. v. F.C.C., 153 F.3d 520 (C.A.8, 1998) (disqualification not required where judge's son had accepted a position as an entry-level computer programmer with one of the parties); Jenkins v. Arkansas Power & Light Co., 140 F.3d 1161 (C.A.8, 1998) (disqualification not required where judge's son had become a new associate at defendant's law firm); In re Kansas Pub. Employees Retirement Sys., 85 F.3d 1353 (C.A.8, 1996) (disqualification not required where judge's daughter had accepted an offer of employment as an associate attorney with the law firm representing one of the parties); Datagate, Inc. v. Hewlett-Packard Co., 941 F.2d 864 (C.A.9, 1991) (disqualification not required where judge's son was an employee of one of the parties); Hewlett-Packard Co. v. Bausch & Lomb Inc., 882 F.2d 1556 (C.A.Fed., 1989) (disqualification not required where judge's son was an employee of one of the parties); United States ex rel Weinberger v. Equifax, Inc., 557 F.2d 456 (C.A.5, 1977) (disqualification not required where judge's son was an associate of the law firm representing one of the parties); Faith Temple Church v. Town of Brighton, 348 F.Supp.2d 18 (W.D.N.Y., 2004) (disqualification not required where judge's son had been offered, and had accepted, an associate position with the law firm representing one of the parties); In re Mercedes-Benz Antitrust Litigation, 226 F.Supp.2d 552 (D.N.J., 2002) (disqualification not required where judge's son had become a partner in a law firm representing one of the parties); United States v. Edwards, 39 F.Supp.2d 692 (M.D.La., 1999) (disqualification not required where judge's son was an associate in the law firm that represented a codefendant); Cloverdale Equip. Co. v. Manitowoc Engineering Co., 964 F.Supp. 1152 (E.D.Mich., 1997) (disqualification not required where *576 judge's son was an associate with the law firm that represented one of the parties); Nobelpharma Ab v. Implant Innovations, Inc., 930 F.Supp. 1241 (N.D.Ill., 1996) (disqualification not required where judge's daughter was a partner in the law firm that represented one of the parties); Wilmington Towing Co., Inc. v. Cape Fear Towing Co., Inc., 624 F.Supp. 1210 (E.D.N.C., 1986) (disqualification not required where judge's son worked as a summer associate and had tentatively accepted employment with the law firm that represented one of the parties); Miller Industries, Inc. v. Caterpillar Tractor Co., 516 F.Supp. 84 (S.D.Ala., 1980) (disqualification not required where judge's father was "of counsel" to the law firm representing one of the parties).

7. GOVERNMENTAL ATTORNEYS
Although MCR 2.003(B)(6) makes no distinctions between judges' relatives who work in the private sector and judges' relatives who work in the public sector, the potential for conflict is considerably less in the case of a relative working for a public office, such as our spouses, than in the case of one working for a private office: (a) the compensation of our spouses is unaffected by whether the Attorney General's office prevails in a given lawsuit; (b) the financial viability of the Attorney General's office is unaffected by whether it prevails in a given lawsuit; (c) the Attorney General's office, unlike a private law firm, is statutorily obligated to represent a range of interests with which the Attorney General may fundamentally disagree, such as the defense of the policies of a Governor of a different political party, and can exercise little volition in undertaking such representation; and (d) the traditional credo of the prosecutor's office is grounded in the proposition that the prosecutor effectively prevails whenever "justice is done," regardless of whether the prosecutor has actually "won" or "lost" a particular lawsuit.[11] Although MCR 2.003(B)(6) is applicable generally to potential conflicts between judges and their relatives, such potential seems, if anything, more remote in the public than the in private sector.
The Michigan Court of Appeals has held that state disqualification rules do not require the recusal of a judge who was within the fourth degree of consanguinity to the prosecuting attorney. People v. Dycus, 70 Mich.App. 734, 246 N.W.2d 326 (1976). There, the prosecuting attorney did not appear or personally participate in the proceedings. Id. at 736, 246 N.W.2d 326. The Ohio Supreme Court employed this same rationale in In re Disqualification of Carr, 105 Ohio St.3d 1233, 826 N.E.2d 294 (2004). There, the court stated:
Relationships among lawyers in government agencies, however, are different. Salaried government attorneys simply "`do[] not have the financial interest in the success of departmental representation that is inherent in private practice.'" As long as the government attorney whose conflict of interest prevents him or her from handling a particular matter is effectively screened from any participation in the case, other attorneys in the office can, in most circumstances, continue to handle the case. [Id. at 1236, 826 N.E.2d 294 (citations omitted).]
*577 The Ohio court denied a motion for the disqualification of a judge whose spouse worked as a prosecutor in the same office that was prosecuting the case where the judge's spouse "neither entered an appearance in the case nor participated in the preparation or presentation of the case." Id. at 1237, 826 N.E.2d 294.
Similarly, as already noted, the Wisconsin Supreme Court did not require disqualification where a trial judge's wife, who was an assistant district attorney, did not participate in the case. State v. Harrell, 199 Wis.2d 654, 546 N.W.2d 115 (1996). The court stated that the disqualification statute would be "too broad" if it swept in "every government attorney who happens to be employed in the same county office or governmental department." Id. at 659-660, 546 N.W.2d 115. Further, it noted that "a member of a government prosecutor's office does not have the same type of interest in the outcome of a trial as does a member of a private law firm" because of the lack of financial and reputational interest. Id. at 662, 546 N.W.2d 115.
Other courts have reached similar conclusions regarding judges' lawyer-relatives who worked for the government. See, e.g., State ex rel Brown v. Dietrick, 191 W.Va. 169, 176, 444 S.E.2d 47 (1994) ("[That] a magistrate's spouse is the chief of police of a small police force does not automatically disqualify the magistrate, who is otherwise neutral and detached, from issuing a warrant sought by another member of such police force," though prudence might dictate curtailing the magistrate's involvement in this small town context); Trimble v. State, 316 Ark. 161, 170-172, 871 S.W.2d 562 (1994) (finding no abuse of discretion when a judge did not disqualify himself where his son worked as an errand boy for the prosecutor's office); People v. Moffat, 202 Ill.App.3d 43, 148 Ill.Dec. 50, 560 N.E.2d 352 (1990) (rejecting a claim of unfair trial based on the fact that the judge's son worked as an assistant state's attorney in a different division); State v. Logan, 236 Kan. 79, 689 P.2d 778 (1984) (affirming the trial court's denial of a disqualification motion where the judge's son worked as an assistant district attorney but not on the particular case); see also United States v. Caggiano, 660 F.2d 184 (C.A.6, 1981) (refusing to impute a conflict of interest of one attorney to all the attorneys in a United States Attorney's office).

8. "APPEARANCE OF IMPROPRIETY"
Plaintiffs argue that, even if our spouses have not participated in a case, we should recuse ourselves because there is an "appearance of impropriety" for us to participate in cases in which the Attorney General's office is involved. In support of this argument, plaintiffs cite Canon 2 of the Michigan Code of Judicial Conduct, which indicates that judges should avoid all impropriety and appearance of impropriety.
Putting aside for the moment what constitutes the "appearance of impropriety" in the specific context of judicial disqualification, Justice Mallett wrote for this Court that a judge "is disqualified when he cannot hear a case impartially pursuant to MCR 2.003(B)." Cain v. Dep't of Corrections, 451 Mich. 470, 494, 548 N.W.2d 210 (1996) (emphasis in original). "The court rule sets forth a list of situations that are deemed to be the equivalent of an inability to hear a case impartially.... MCR 2.003(B)(1) requires a showing of actual bias. Absent actual bias or prejudice, a judge will not be disqualified pursuant to this section."[12]Id. at 494-495, 548 N.W.2d 210 (emphasis in original).
*578 Moreover, concerning the exhortation in Canon 2 to avoid the "appearance of impropriety," this must be read in the context of Canon 3(C), which states with regard to the specific question of judicial disqualification that a judge "should raise the issue of disqualification whenever the judge has cause to believe that grounds for disqualification may exist under MCR 2.003(B)." (Emphasis added.) Thus, Canon 3(C) is specific and directly on point. The "appearance of impropriety" standard is relevant not where there are specific court rules or canons that pertain to a subject, such as judicial disqualification, but where there are no specific court rules or canons that pertain to a subject and that delineate what is permitted and prohibited judicial conduct. Otherwise, such specific rules and canons would be of little consequence if they could always be countermanded by the vagaries of an "appearance of impropriety" standard. Here, there are specific rules and canons that pertain to judicial disqualifications, and these must be understood as defining what does and what does not constitute an impropriety in this realm.
Moreover, even if the "appearance of impropriety" standard is relevant herewhich we do not believe it to be in light of the specific commands of MCR 2.003(B) and Canon 3(C)this standard cannot be equated with any person's perception of impropriety, lest a judge find himself or herself subject to a barrage of recusal motions on the part of any person who apprehends an impropriety, however unreasonable this apprehension. Rather, this standard must be assessed in light of what can be gleaned from existing court rules and canons, historical practices and expectations, and common sense. As observed by Chief Justice Rehnquist in responding to a motion that he disqualify himself from a case involving his son's law firm:
[The "appearance of impropriety"] inquiry is an objective one, made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances. I have already explained that my son's personal and financial concerns will not be affected by our disposition of the [matters in this case]. Therefore, I do not believe that a well-informed individual would conclude that an appearance of impropriety exists simply because my son represents, in another case, a party that is also a party to litigation pending in this Court. [Microsoft Corp, supra at 1302, 121 S.Ct. 25 (citations omitted).]
Apart from the justices themselves, there is no public body in Michigan that is authorized, before the fact, to conclusively determine what constitutes the "appearance of impropriety." To adopt a different understanding of this concept than that set forth by Chief Justice Rehnquist, where specific rules and canons of conduct are in place, would subject judges, especially justices of this Court, to vague, subjective, and increasingly politically directed, allegations of misconduct, against which no justice could effectively defend himself or herself.[13]

*579 9. RECUSAL AND THE SUPREME COURT
The issue of recusal by justices of the Supreme Court involves special considerations given Const. 1963, art. 6, § 2. This is because, unlike members of the trial courts or the Court of Appeals, there can be no replacement of a justice who must recuse himself or herself. Unlike those courts in which a substitute judge can take the place of a recused judge, there is no such availability on the Supreme Court. Instead, upon a recusal by a justice, this Court must proceed with less than a full contingent of its members. Not only does this increase the likelihood of an even division of the Court's memberseffectively rendering null and void the work of the Court and leaving intact lower court decisions that a majority of justices may view as wrongly decidedit also deprives the public and litigants of the full collegial body that they have selected as the state's court of last resort. These unfortunate consequences do not mean that a justice must not recuse himself or herself in appropriate instances, but they do suggest that a justice must consider carefully the implications of a disqualification decision. That is, when it is not necessary to recuse, it is necessary not to recuse. Each unnecessary recusal adversely affects the functioning of the Court.
It is for similar reasons that the federal courts have developed the "duty to sit" doctrine. Pursuant to this doctrine, there is an obligation to remain on any case absent good grounds for recusal. Laird v. Tatum, 409 U.S. 824, 837, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (noting that the court of appeals had unanimously concluded that judges have a duty to sit when not disqualified that is equally as strong as the duty not to sit when disqualified). "[W]here the standards governing disqualification have not been met, disqualification is not optional; rather, it is prohibited." In re Aguinda, 241 F.3d 194, 201 (C.A.2, 2001); cf. SCA Services v. Morgan, 557 F.2d 110, 113 (C.A.7, 1977); explanatory note I.3 to 28 USCS 455.

10. CAMPAIGN CONTRIBUTIONS
Although plaintiffs have not raised the issue of campaign contributions, the issue has been a recurrent subject of media accounts that have commented on our spouses' employment, and we briefly address this in order to avoid recurrent motions for recusal.
That a judge has at some time received a campaign contribution from a party, an attorney for a party, a law firm employing an attorney for a party, or a group having common interests with a party or an attorney, cannot reasonably require his or her disqualification. For there is no justice in Michigan in modern times who has not received campaign contributions from such persons. Nor is there a justice whose opponents have not received campaign contributions from such persons. And, increasingly, "opposition" campaigns have arisen in which contributions *580 are specifically undertaken against particular justices. It is simply impossible for the Supreme Court, as well as most other courts in Michigan, to function if a lawful campaign contribution can constitute a basis for a judge's disqualification. For if a contribution to a judicial candidate can compel a judge's disqualification, then a contribution to an opponent, or the funding of an opposition campaign, must operate in a similar fashion. If so, it would be a simple expedient for a party or a lawyer to "mold" the court that will hear his or her cases by tailoring contributions and opposition contributions.
Even more fundamentally, however, "We, the people, of the State of Michigan," through the Constitution, have created a system of judicial selection in our state in which candidates are nominated by, and elected through, a political process. It is a different system of judicial selection than that which exists in other states and in the federal system, and reasonable persons can debate the merits and demerits of this system. Each of us in different forums has urged various reforms of this system. Nonetheless, the present system has been ordained by our Constitution, and it defines the environment in which those aspiring to judicial office must undertake their efforts.
The premise of our system of judicial selection in Michigan is that judges will periodically be held accountable for their performance. There are no lifetime appointments to judicial positions, and there are no unaccountable committees who determine whether judges should be maintained in office. Thus, the most notable strength of our system of judicial selection is that it requires candidates for judicial office to go out among the electorate and explain why they should be placed in office. This system fosters communication with the electorate, speech-making, debate, the search for support and endorsements, campaign advertising, expressions of judicial philosophy, and efforts to persuasively explain why the election of one or the other candidate ought to be preferred.
Such campaigns must be directed toward an electorate in excess of four million people. In the case of Supreme Court justices, such campaigns will typically involve the expenditure of hundreds of thousands, or even millions, of dollars on television, radio, newspaper, and other advertising, with opposition campaigns expending similar amounts. These expenditures are not funded magically, but are raised from among the electorate, and from organizations that represent those among the electorate.
Indeed, given the premise of our system of judicial selection that there should be periodic elections for judicial office, it would seem that it is better that campaigns be well-funded and informative, and that candidates be afforded the fullest opportunity to explain their differing perspectives on the judicial role, than that campaigns be poorly funded and result in candidates securing election on the basis of little more than a popular surname.
There will simply be no end to the alleged "appearance of impropriety" if every contribution to a candidate, or every contribution to an opposing candidate, or every independent opposition campaign, is viewed as raising an ethical question concerning a judge's participation in a case in which a contributor or an opposition contributor is involved. Again, while cogent arguments have been made in favor of judicial selection reform, until such reforms are adopted by the people of Michigan, there is little alternative to active judicial participation in the electoral process and the concomitant need to raise funds in order to effectively participate and communicate in this process. If justices *581 of the Supreme Court, in particular, were to recuse themselves on the basis of campaign contributions to their or their opponents' campaigns, there would be potential recusal motions in virtually every appeal heard by this Court, there would be an increasing number of recusal motions designed to effect essentially political ends, and there would be a deepening paralysis on the part of the Court in carrying out its essential responsibilities.
Of considerable relevance to the subject of campaign contributions as a basis for recusal is the Legislature's establishment of limits on individual and political action committee contributions to Michigan judicial candidates. MCL 169.252 and 169.269. Such limits must be understood as clearly reflecting the Legislature's, and the people's, understanding that contributions in these amounts will not supply a basis for disqualification. That is, lawful contributions made within these limits, lawfully reported and lawfully disclosed, cannot fairly constitute a basis for judicial disqualification. Otherwise, these statutes, just as MCR 2.003 and Canon 3(C), would be little more than cleverly devised snares to be exploited by those wishing to undermine individual judges. A judge who plays by the rules should not be required to recuse himself or herself on the basis of such conduct. Thus, we assume, as have all the justices before us, that the Legislature decided that lawful campaign contributions would not give rise to a basis for judicial recusal.

11. CONCLUSION
Pursuant to MCR 2.003(B)(6), we would each disqualify ourselves if our respective spouses were participating as lawyers in this case, or if any of the other requirements of this court rule were not satisfied. However, because our spouses are not so participating, and because none of the listed grounds exists, we are obligated not to recuse ourselves from participation.[14] The motion to disqualify is denied.
MICHAEL F. CAVANAGH, J., states as follows:
I do not participate in the decision on the motions for disqualification of Chief Justice Taylor and Justice Markman. Historically, while such motions are always addressed to the entire Court, the decision on whether to grant or deny such a motion is, and always has been, left to the sole discretion of the challenged justice. Currently, our court rules do not address disqualification of a justice of this Court. I am now persuaded that minimal due process concerns demand that they should. To this end, I have proposed to the Court the following court rule:

DISQUALIFICATION OF JUSTICE

(A) Who May Raise.
A party may raise the issue of a justice's disqualification by motion or the justice may raise it.

(B) Grounds for Disqualification.
Disqualification of a justice is warranted if any of the following apply:
(1) The justice is actually biased or prejudiced against or for a party or attorney in the proceeding.
(2) The justice's impartiality might reasonably be questioned.
(3) The justice has personal knowledge of disputed evidentiary facts concerning the proceeding.
(4) The justice has been consulted or employed as an attorney in the matter in controversy.
(5) The justice was a partner of a party, attorney for a party, or a member of a law *582 firm representing a party within the preceding two years.
(6) The justice knows that he or she, individually or as a fiduciary, or the justice's spouse, parent, or child wherever residing, or any other member of the justice's family residing in the justice's household, has a more than de minimis economic or other interest in the subject matter in controversy.
(7) The justice or the justice's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
(a) is a party to the proceeding, or an officer, director, or trustee of a party;
(b) is acting as a lawyer in the proceeding;
(c) is known by the justice to have a more than de minimis interest that could be substantially affected by the proceeding; or
(d) is to the justice's knowledge likely to be a material witness in the proceeding.
(C) Procedure.
(1) Ruling. The Supreme Court shall decide the motion for disqualification of a justice. The challenged justice shall not participate in the determination. The Supreme Court's decision shall include the reasons for its grant or denial of the motion for disqualification.
(2) Motion Granted. When a justice is disqualified, the proceeding will be decided by the remaining justices of the Supreme Court.
It is my sincere hope that this Court will consider and act on this revision, or a variation of it, at one of our administrative conferences in March.
WEAVER, J., states as follows.
I do not participate in the decision regarding the motion to disqualify Chief Justice Taylor and Justice Markman and, therefore, do not address whether Chief Justice Taylor and Justice Markman should recuse themselves because their spouses work for the Attorney General, who represents the state of Michigan in this matter.
I write separately, however, because the statement of Chief Justice Taylor and Justice Markman denying this motion makes numerous incorrect conclusions regarding issues related to the appropriate standards for a justice's participation or nonparticipation in a case. It is unnecessary to respond to every conclusion they draw, because the proper forum for such a discussion is in the context of public and formal proposals for revision of the Michigan Court Rules governing disqualification.[1] It should be noted that the views expressed by Chief Justice Taylor and Justice Markman do not reflect those of all their colleagues, and are not binding on future decisions of this Court or on the decisions of individual justices on motions for their disqualification.

I
Chief Justice Taylor and Justice Markman assert that "there can be no replacement of a [Michigan Supreme Court] justice who must recuse himself or herself." Ante at 579. For this proposition, they rely on the federal "duty to sit" doctrine that the justices of the United States Supreme Court apply to themselves. However, the federal "duty to sit" doctrine is inapplicable to Michigan Supreme Court *583 justices. A federal statute prohibits the temporary replacement of a United States Supreme Court justice by a retired federal judge.[2] But when a Michigan Supreme Court justice does not participate in a case for any reason, the Michigan Constitution permits that justice to be replaced by an active or retired judge.
Michigan's constitution, Const. 1963, art. 6, § 23, as amended in 1968, allows this Court to assign active or retired judges to perform the judicial duties of Michigan Supreme Court justices. Const. 1963, art. 6, § 23 provides in pertinent part:
... The supreme court may authorize persons who have been elected and served as judges to perform judicial duties for limited periods or specific assignments.
This provision does not distinguish the "judicial duties" of Michigan Supreme Court justices from those of other judges. It plainly provides for temporary assignments of active or retired judges to perform "judicial duties"; it grants this Court the authority to "authorize persons who have been elected and served as judges to perform judicial duties for limited periods or specific assignments."[3] The "judicial duties" referenced by Const. 1963, art. 6, § 23 do not exclude, and therefore include, the "judicial duties" of Supreme Court justices who are, for any reason, unable to perform them.[4] Thus, in light of the plain text of Const. 1968, art. 6, § 23, Chief Justice Taylor and Justice Markman's analogy to the federal court's "duty to sit" doctrine is incorrect and misleading.

II
Chief Justice Taylor and Justice Markman also express concern about the application of a standard for judicial disqualification that is based on the appearance of impropriety. Canon 2 of the Michigan Code of Judicial Conduct expressly provides that a judge "must avoid all impropriety and appearance of impropriety."[5] In their motion for disqualification, plaintiffs argue that the employment of Chief Justice Taylor's spouse and Justice Markman's spouse in the Attorney General's office creates an appearance of impropriety even if their spouses are not involved in the case.
*584 In response, Chief Justice Taylor and Justice Markman argue that the mandate of Canon 2 that judges avoid appearances of impropriety is irrelevant to the question of the plaintiffs' motion for their disqualification because MCR 2.003(B), which defines the grounds for judicial disqualification, does not expressly include the appearance of impropriety as a ground for judicial disqualification. It must be noted, however, that MCR 2.003(B) provides a nonexclusive list of the grounds for disqualification.[6] The grounds that are listed in MCR 2.003(B) are simply the most obvious examples of when a judge can be deemed unable to "impartially hear a case...." MCR 2.003(B). This Court has previously recognized that "there may be situations in which the appearance of impropriety on the part of a judge or decisionmaker is so strong as to rise to the level of a due process violation."[7]
Chief Justice Taylor and Justice Markman defend their decision not to recuse themselves by citing the American Bar Association Model Code of Judicial Conduct (Model Code),[8] Canon 3(E), which they assert is "consistent with" MCR 2.003(B)(6). Ante at 572. But Chief Justice Taylor and Justice Markman fail to mention that the Model Code bases its disqualification policies on the appearance of impropriety standard. Canon 3(E) provides that a judge shall disqualify himself or herself in a proceeding "in which the judge's impartiality might reasonably be questioned ...."
The ABA Model Code of Judicial Conduct was adopted in 1924. Canon 2 originally provided that a judge should avoid both impropriety and the appearance of impropriety. In 1972, language was added to Canon 3 in order to make the standard for judicial disqualification more objective.[9] In 1990, further revisions made the disqualification rule mandatory by replacing "should" with "shall." Currently Canon 2 of the Model Code states, "A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities."[10] Canon 3(E)(1) states that a judge "shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned ...."[11]
Judge M. Margaret McKeown[12] has noted that the appearance of impropriety standard achieves two ends. First, when a judge recuses himself or herself to avoid the appearance of impropriety, the result is that the judge avoids risking actual bias. Second, when a judge recuses himself or herself, the judge eliminates the appearance of impropriety and thereby engenders public confidence in the judiciary.[13]
In commenting on the effect recusal has on the public's confidence in the judiciary, Judge McKeown further notes:
The guiding principles of the Canonsintegrity, impartiality, and avoidance of the appearance of improprietyserve as daily reminders of the public trust placed in judges. The Canons also sensitize judges to the public's expectation of the judiciary. The Canons are *585 not just for the benefit of judges, but for the judged and the public at large.
. . . "Public confidence in the integrity and impartiality of the judiciary is undermined when a judge's conduct creates the perception that a case has been prejudged or that there is a bias against a party, regardless of whether the perceived bias or prejudice exists." ...
Confidence in the judiciary's integrity also is the foundation of judicial independence. Indeed, decisionmaking by a respected neutral is the essential function of a court. All of the foundations of judgingsuch as respect for the text of the law and precedentreinforce the message of impartiality. The appearance standard similarly undergirds judicial independence.[14]
Finally, I cannot agree with Chief Justice Taylor and Justice Markman's suggestion that application of the appearance of impropriety standard would "vitiate" the current provisions of MCR 2.003(B). See ante at 577 n. 12. The court rules do not diminish the standards of conduct imposed on members of the judiciary by the Code of Judicial Conduct. Indeed, it is difficult to conceive how the application of a stricter and higher standard of conduct, especially for Supreme Court justices, could possibly "make imperfect, faulty, or impure; spoil; [or] corrupt"[15] MCR 2.003(B)'s nonexclusive list of grounds for the disqualification of a judge.

III
Chief Justice Taylor and Justice Markman also reject plaintiffs' argument that a justice should only participate in a case in which the justice's spouse is employed by a legal representative of a party when all parties agree that the justice can participate. Chief Justice Taylor and Justice Markman opine that to allow the parties input on a justice's participation in such a way would "politicize and introduce gamesmanship into the judicial process." Ante at 571. However, Chief Justice Taylor and Justice Markman overlook the fact that MCR 2.003(D) codifies the very process that they fear and allege will politicize the judicial process and encourage gamesmanship.
MCR 2.003(D) provides that "[i]f it appears that there may be grounds for disqualification, the judge may ask the parties and their lawyers to consider, out of the presence of the judge, whether to waive disqualification."[16] The rule does not limit the application of this process to cases of proven actual bias and prejudice. The process may be employed anytime "there may be grounds for disqualification...."[17] Rather than introducing games and politics into the judicial process, this rule ensures that the record in a case reflects that the parties and the judge willingly proceeded, despite the presence of a potential ground for the judge's disqualification.

IV
Chief Justice Taylor and Justice Markman make a misleading and disingenuous suggestion that public opinion regarding when a justice should participate where his or her spouse works for a legal representative of a party is to be found in the electoral process. They ignore the fact that it is the responsibility of the justices of this Court to draft and adopt the rules of procedure governing the disqualification of judges. As aptly noted by Justice Boyle in *586 comments regarding attorney disciplinary rules:
It is not a satisfactory answer for this Court to say a rule is a rule. If the rules we have promulgated for disciplinary proceedings are not functioning as envisioned in real world applications, it is our responsibility, after allowing for input through publication and comment, to fairly and sensibly address the problem. [Grievance Administrator v. Deutch, 455 Mich. 149, 171, 565 N.W.2d 369 (1997) (BOYLE, J. concurring).]
If, as it begins to appear, the public's confidence in the judiciary is being eroded by the standards by which a justice decides to participate in a case, it is incumbent on this Court to address the public's concerns in a clear, orderly, fair, specific, and public way.
Moreover, waiting to cast a vote at that justice's next election (anywhere from one to seven years away) is not a practical or adequate remedy. It is without question not a fair process to require a party, whose case may be influenced by a justice's relationship with a party's legal representative, to wait until the justice's next election to cast a lone vote against an incumbent justice. That is why a current court rule, MCR 2.003(C)(3), permits a party to request a review of a judge's decision to deny a request for recusal.[18]

V
Without question, the current rules regarding disqualification are imperfect and need revision as they apply to justices of this Court. Indeed, a majority of this Court has at times refused to apply provisions of the existing rule on disqualification, MCR 2.003, to themselves.[19]
Lack of clarity and order even persists regarding whether a justice should publish his or her reasons for denying a motion to recuse himself or herself. Chief Justice Taylor and Justices Corrigan, Young, and Markman assert that a justice need not do so. I disagree. As I have stated before, Const. 1963, art. 6, § 6 provides that "[d]ecisions of the supreme court ... shall be in writing and shall contain a concise statement of the facts and reasons for each decision ...."[20] The provision requires that justices give written reasons for each decision, which is indicated by their joining an opinion or by writing their own separate opinions. There is no more fundamental purpose for this constitutional requirement that the decisions of the Court be in writing than for the decisions to be accessible to the citizens of the state. Because a justice's decision to participate or not participate in a case can change the outcome of a case, the decision is a matter of public significance. Public access and understanding regarding a justice's participation *587 or nonparticipation is vital to the public's ability to assess the performance of the Court and the performance of the Court's individual justices. Thus, art. 6, § 6 requires that a justice's self-initiated decision and reasons not to participate, or a challenged justice's decision and reasons to participate or not participate, should be in writing and accessible to the public.
The rules governing the disqualification standards and procedures for Michigan Supreme Court justices should be made clear, orderly, fair, specific, and public. They should require the highest and strictest standards for Michigan Supreme Court justices.
The time for this Court to address the procedures governing the disqualification of justices is long overdue; at stake is the public's trust and confidence in the independence of Michigan's Supreme Court.
For almost three years, I have repeatedly called for this Court to recognize, publish for public comment, place on a public hearing agenda, and address the need to have clear, orderly, fair, specific, and public procedures concerning the participation or nonparticipation of justices.[21] This has not been done, although there have been eight public hearings held by this Court on other administrative matters and thus eight opportunities to do so. While this Court opened an administrative file regarding the disqualifications procedures for justices on May 20, 2003,[22] it has yet to adequately address the matter.[23]

VI
As I have said previously, I am opposed to the entry of any order in a case such as this that involves a request for the disqualification of a justice until this Court publishes proposals for public comment, places the issue on at least one public hearing for administrative matters, and resolves and makes clear for all to know the proper, orderly, fair, and specific procedures for handling motions for the disqualification of Supreme Court justices from participation in a case.
MARILYN J. KELLY, J., states as follows:
I do not participate in Chief Justice Taylor and Justice Markman's decision to deny the motion to disqualify them from ruling on this case. Following the Court's established procedure, I leave the decision to the discretion of the challenged justices.
However, I believe this time-honored unwritten procedure is deeply flawed, and I agree with Justice Weaver that the Court should establish a particularized, written, and published procedure to govern motions to disqualify a Supreme Court justice from participation in a case. I applaud Justice Cavanagh for proposing such a court rule.
*588 Among the flaws in the present procedure is that it makes no provision for a situation in which a majority of justices disagree with the justice who refuses to recuse himself or herself. For example, the challenged justice might misapprehend the extent of the appearance of impropriety of sitting on a case. Also, because each recusal decision is issued as an order of the Court, it appears to come from all the justices, whereas that is not the case.
In addition to the provisions suggested by Justice Cavanagh and Justice Weaver, a justice should be ineligible to sit in judgment of a case in which he or she ruled in a lower court. The justices of the United States Supreme Court follow this rule. Also, the Court should investigate the possibility that a substitute judge may sit in place of a disqualified justice. In that way, there would always be seven impartial and disinterested votes on every case.
CORRIGAN, J., states as follows:
I am not participating in Chief Justice Taylor and Justice Markman's denial of this disqualification motion, as they must decide the issue for themselves.[1] I write separately to note that accepting plaintiffs' argument requires reverting to a long-discredited assumption about the role of women in society and regressing from progress hard won.
In Bradwell v. State of Illinois, 83 U.S. (16 Wall.) 130, 139-142, 21 L.Ed. 442 (1873), Justice Bradley concurred in denying a license to practice law to a woman. He stated:
Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life.... The harmony, not to say identity, of interests and views which belong, or should belong, to the family institution is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband. So firmly fixed was this sentiment in the founders of the common law that it became a maxim of that system of jurisprudence that a woman had no legal existence separate from her husband, who was regarded as her head and representative in the social state .... [Id. at 141.]
He then concluded that a woman's consequent incapacity to contract prevented her from competently serving as an attorney. Id. Subsequently, this misconception of the capacity of women has received the criticism it warrants. See, e.g., Frontiero v. Richardson, 411 U.S. 677, 684-686, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).
Similar to the proposition in Bradwell, plaintiffs' argument would impose a constraint on professional couples and most certainly on a married professional woman's ability to practice law. Where her spouse engages in the same profession, either she or he must submit to a disability on employment. Professional advancement for one would require a corresponding narrowing of opportunity for the other. Here, plaintiffs' implication of an appearance of impropriety evaporates where no ex parte communication threads between the state office and the justices and where a Chinese Wall[2] separates these justices' spouses from participating in cases before our Court. No impropriety exists in realizing the equality for which women have long struggled. I reject the notion, more than 100 years after Bradwell, that our *589 Court should remotely diminish the benefit received from the active participation of women before and in our state's bench and bar.
YOUNG, J., states as follows:
Historically, in response to a motion to disqualify, the subject justice decides for himself or herself whether there are valid grounds for disqualification and therefore whether to participate in the case. Rarely has a Michigan Supreme Court justice provided an explanation for the decision on such a motion, and in no case that I have found has another justice commented on the subject justice's decision.
Of late, a majority of the justices of this Court have become the recurrent targets of an increasing number of calculated and opportunistic motions to disqualify. Because this pattern does not appear to be abating, I believe that it is appropriate on this occasion to depart from our historic practice of silence and to comment on the joint statement of Chief Justice Taylor and Justice Markman rejecting the motion to disqualify themselves in this case.
I have not participated in their decisions on this motion because, as noted, decisions on such motions are left to the individual justice. However, I support their joint statement and fully concur in the legal analysis of the ethical questions presented in it.
NOTES
[1] Chief Justice Taylor's spouse, Lucille Taylor, has worked part-time as an independent contractor providing legal advice to the Attorney General's office since mid-2004. Justice Markman's spouse, Mary Kathleen Markman, has worked in the Governmental Affairs Bureau of the Attorney General's office since September 2005, at which time she was hired through the regular hiring processes of that office. There are an estimated 550 persons working in the Attorney General's office, including more than 300 attorneys. Neither of our spouses has undertaken any legal work in these positions pertaining to matters that have been brought before this Court. Further, neither of our spouses is employed in a supervisory capacity, and thus we have heard no cases brought by attorneys under their authority or supervision. Moreover, efforts have been undertaken by the Attorney General's office to create a permanent "wall" or barrier between the work performed by our spouses and cases that may be brought to this Court. Each of us on past occasions has recused himself from participation in cases in which our respective spouses have been involved in their previous legal capacities, and we remain cognizant of the need to recuse ourselves in the future should a conflict arise. Further, in contrast to the policy of the United States Supreme Court, see n 6 infra, it has been our practice to recuse ourselves from participation in all cases in which our respective spouses have participated at any stage of the proceedings, whether or not they have served as "lead counsel."

We note further for the record that it is not unusual for a judge's spouse or other relative to be employed as a lawyer, or even as a lawyer in a public agency, and that such employment is becoming increasingly common. Justice Corrigan's late husband was a lawyer and law professor at Wayne State University; it was her policy not to participate in cases in which her husband had been involved, but she heard cases involving Wayne State University. Former Justice Riley's husband was a lawyer; she heard cases in which her husband's firm represented a party unless her husband had personally participated in the case. Former Justice Boyle was married to a trial judge and she typically declined to participate when an appeal involved a decision made by her husband as a trial judge, but heard other appeals from his court. Former Justice Archer's wife was a trial judge; he did not review her decisions, but he reviewed other cases originating from the bench on which she served. Former Justice Coleman was married to a trial court judge; she declined to review his decisions, but she did hear other cases from his court. Former Justice Brickley had a son practicing law while Justice Brickley sat on this Court; he heard cases in which his son's firm represented a party unless his son had personally participated in the case. Justice Cavanagh has a daughter who practices law; he hears cases in which his daughter's firm represents a party unless she has personally participated in the case. Justice Cavanagh also has a nephew who is a Court of Appeals judge; he reviews his nephew's opinions. Former Justice Griffin had a son who was a Court of Appeals judge while he was a justice; he reviewed decisions of Court of Appeals panels on which his son sat. Former Justice Levin had a brother who practiced law; he participated when his brother's firm was involved in an appeal and disqualified himself only if his brother appeared as counsel. Moreover, to cite other examples, Court of Appeals Judge Fitzgerald and former Ingham Circuit Judge Peter Houk have had spouses or children (or both) who worked in the Attorney General's office while they sat on state courts, and Justice Cavanagh had a niece who worked for the Attorney General's office, and they followed a similar approach to recusal. Numerous other judges throughout Michigan, state and federal, over the years have honorably accommodated their judicial responsibilities with the fact of family members who have been employed by private law firms and prosecutor's offices coming before their courts.
[2] With rare exceptions, see, e.g., Cheney v. United States Dist. Court for the Dist. of Columbia, 541 U.S. 913, 124 S.Ct. 1391, 158 L.Ed.2d 225 (2004), and Laird v. Tatum, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972), it has been the historic practice of the United States Supreme Court, and this Court, for a justice not to supply reasons for why he or she does or does not recuse himself or herself from participating in a case. We depart from this practice here because the present motion is expressly predicated on media accounts that may, unless they are the subject of a response, produce recurrent motions for recusal on the same grounds.
[3] Indeed, there is nothing inherent in plaintiffs' proposed policy that would limit it to spouses and relatives who work as attorneys. For purposes of this rule, it does not matter, after all, that a spouse or relative is not involved in a case or that he or she stands to gain no material benefit. Instead, all that is significant is the fact of affiliation with an institution; it is mere affiliation that constitutes the "appearance of impropriety." It would not seem to matter that the affiliation is as an attorney, a secretary, a health care manager, or a carpenter, for each would give rise to a similar "appearance of impropriety." The world that plaintiffs would create is one in which the most important thing that a party or attorney would need to know about a judge whose disqualification is desired is, "Who is the judge's wife (husband), and where does she (he) work?"
[4] "It is well established that this provision requires personal participation in the representation, and not just membership in the representing firm, see, e.g., Potashnick v. Port City Constr. Co., 609 F.2d 1101, 1113(CA5), cert. denied, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980)." Statement of Recusal Policy, United States Supreme Court, November 1, 1993. The staff comment to an amendment to GCR 1963, 912.2, the predecessor to MCR 2.003(B), which is predicated on 28 USC 455, see part 4 infra, states that "[a]ttorneys performing legal functions not connected with a particular proceeding are excluded from coverage; only those attorneys who work directly on a case are covered by the language." 402 Mich. cliii (1978). See also Anno.: Disqualification of federal judge, under 28 USCS § 455(b)(5)(ii), on ground that judge's relative is acting as lawyer in proceeding, 73 A.L.R. Fed. 879, 881 (summarizing cases as standing for the proposition that, "[where] a relative of the judge who was associated with the firm representing one of the parties did not actually participate in trying the case, . . . the judge's relative was not acting as an attorney for one of the parties so as to mandate the disqualification of the judge under 28 USCS § 455(b)(5)(ii)").
[5] "[A]ssociates in a law firm do not have a substantial interest in the outcome of cases in which they do not actively participate ...." Anno: Disqualification of judge under 28 USCS § 455(b)(5)(iii), where judge or his or her spouse, or certain of their relatives, is known to have an interest that could be affected by the proceeding, 54 A.L.R. Fed. 855, 856.
[6] Statement of Recusal Policy, United States Supreme Court, November 1, 1993.

[P]ursuant to 28 USC 455(5)(ii), [i]t is also apparent, from use of the present tense, that current participation as a lawyer, and not merely past involvement in earlier stages of the litigation, is required [for a recusal].
* * *
Absent some special factor, therefore, we will not recuse ourselves by reason of a relative's participation as a lawyer in earlier stages of the case. One such special factor, perhaps the most common, would be the relative's functioning as lead counsel below, so that the litigation is in effect "his" or "her" case and its outcome even at a later stage might reasonably be thought capable of substantially enhancing or damaging his or her professional reputation. [Id. (emphasis added).]
[7] See Microsoft Corp. v. United States, 530 U.S. 1301, 121 S.Ct. 25, 147 L.Ed.2d 1048 (2000), in which Chief Justice Rehnquist refused under this statute to recuse himself from participation in a case in which his son was a partner in the law firm representing one of the parties. Justice Scalia has also participated in cases in which his sons worked for law firms representing parties in lawsuits before the United States Supreme Court, including Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). See CNN.com law center archives, (accessed January 12, 2006) ("Legal ethics expert Stephen Gillers of New York University's law school says ...[,] `It's not a basis for disqualification, so long as neither child is involved in the case....'").
[8] Ala. Canons of Judicial Ethics, Canon 3; Ariz. Sup. Ct. R. 81, Canon 3; Ark. Code of Judicial Conduct, Canon 3; Colo. Code of Judicial Conduct, Canon 3; Conn. Code of Judicial Conduct, Canon 3; Del. Judges' Code of Judicial Conduct, Canon 3; Fla. Code of Judicial Conduct, Canon 3; Ga. Code of Judicial Conduct, Canon 3; Hawaii Code of Judicial Conduct, Canon 3; Ill. Sup. Ct. R. 63; Ind. Code of Judicial Conduct, Canon 3; Iowa Code of Judicial Conduct, Canon 3; Kan. Sup. Ct. R. 601A, Canon 3; Ky. Sup. Ct. R. 4.300, Canon 3; Me Code of Judicial Conduct, Canon 3; Md. R. 16-813, Canon 3; Mass. Sup. Jud. Ct. R 3:09, Canon 3; Minn. Code of Judicial Conduct, Canon 3; Miss. Code of Judicial Conduct, Canon 3; Mo. Sup. Ct. R. 2.03, Canon 3; Neb. Code of Judicial Conduct, Canon 3; Nev. Code of Judicial Conduct, Canon 3; N.H. Sup. Ct. R. 38, Canon 3; N.M. Ct. R. 21-400; N.Y. Ct. R. 100.3 (22 NYCRR 100.3); N.C. Code of Judicial Conduct, Canon 3; N.D. Code of Judicial Conduct, Canon 3; Ohio Code of Judicial Conduct, Canon 3; Okla. Stat., Tit. 5, Ch. 1, App. 4, Canon 3; Pa. Code of Judicial Conduct, Canon 3; R.I. Sup. Ct. R., Art. 6, Canon 3; S.C. App. Ct. R. 501, Canon 3; S.D. Code of Judicial Conduct, Canon 3; Tenn. Sup. Ct. R. 10, Canon 3; Tex. R. Civ. P. 18b; Utah Code of Judicial Conduct, Canon 3; Vt. Code of Judicial Conduct, Canon 3; Va. Canons of Judicial Conduct, Canon 3; Wash. Code of Judicial Conduct, Canon 3; W.Va. Code of Judicial Conduct, Canon 3; Wy. Code of Judicial Conduct, Canon 3.
[9] There are minor variations among these provisions, none of which would have consequences for our participation in this case. Although the rules in California, the District of Columbia, Idaho, Louisiana, and Wisconsin are stated differently, none would require our recusal. Cal Code of Judicial Ethics, Canon 3 (requires recusal where judge's relative is "associated in the private practice of law with a lawyer in the proceeding"); DC Superior Ct R Civ P 63-I (requires recusal where judge has a "personal bias or prejudice either against the party or in favor of any adverse party"); Idaho R. Civ. P. 40(d)(2) (requires recusal where judge is "interested in the action or proceeding"); La Code of Judicial Conduct, Canon 3 (requires recusal where the "judge's impartiality might reasonably be questioned"); Wis. Stat. 757.19 (requires recusal where judge has a "personal interest in the outcome of the matter").
[10] However, the last sentence of this quotation does not represent the universal practice. Chief Justice Rehnquist, for example, participated in cases in which the law firm in which his son was a partner represented one of the parties. See n. 7 supra. Likewise, Justice Brickley participated in cases involving the firm in which his son was a partner (as long as his son did not participate in the case). See also Potashnick v. Port City Constr. Co., 609 F.2d 1101 (C.A.5, 1980) (recusal not required where judge's father was a partner in the firm representing one of the parties).
[11] "[R]egardless of [the government lawyer's] powers and duties, because his compensation and clientele are set, and the prestige of the office as a whole is not greatly affected by the outcome of a particular case," a judge considering a disqualification motion involving a lawyer-relative in government service may consider "a government attorney [to be] only `engaged in the case' when he has worked on the case directly." 46 Am. Jur. 2d, Judges, § 139, p. 237.
[12] Unlike the disqualification rules of some states, there is no "appearance of impropriety" language contained in MCR 2.003(B), doubtless because its drafters were concerned about such language vitiating the specific provisions set forth in the rule.
[13] Plaintiffs reference several opinions of a state bar committee on judicial ethics. In response, we note that these opinions are merely advisory, that they are not binding on any court, and that they are merely the opinions of volunteer lawyers of a state bar committee. While we are respectful of their efforts, we can only observe that these opinions are inconsistent with MCR 2.003, and are entirely lacking in analysis as to why a policy different than MCR 2.003 should obtain in this state (explained no doubt by the committee's assertion that "[i]t is not within the committee's province to research appellate decisions, statutory law, or court rules, or to express an opinion as to any provision of law applicable to the contemplated conduct which is the subject of an inquiry"). State Bar of Michigan, General Information (accessed January 12, 2006).

Moreover, the view of this committeethat a judge can never participate in any case involving a law firm or public agency in which a relative is employed, regardless of the relative's position and regardless of the relative's relationship to the casewill ensure that a judge's spouse who is a lawyer will effectively become unemployable. No law firm of any size and no public employer will ever hire a lawyer whose mere presence forces the recusal of a judge who is that lawyer's relative. The committee's rule is unworkable, unfair, and lacks any grounding in the actual court rules or historical practices of this state. Nor is the committee's rule mitigated at all, in our judgment, by the committee's allowance that a judge may participate in a case if all lawyers agree to allow such participation. This is a recipe for legal gamesmanship and political machination, enabling lawyers to pick and choose which judges will be permitted to hear their cases.
[14] Plaintiffs' application for leave to appeal remains pending at this time.
[1] MCR 1.201 provides for notice to the State Bar of Michigan and various associations of Michigan judges of amendments to the Michigan Court Rules and for public hearings on proposed amendments. This Court may dispense with the notice requirements only if "there is a need for immediate action or if the proposed amendment would not significantly affect the delivery of justice." MCR 1.201(D).
[2] The statute authorizing the assignment of retired Supreme Court justices and retired district and circuit judges to judicial duties specifically excludes assignments to the United States Supreme Court. 28 USC 294(d). Federal circuit and district judges may be temporarily assigned to other federal circuit or district courts. 28 USC 291 and 292. There is no specific statutory provision for temporary assignment of active federal circuit or district judges to the United States Supreme Court.
[3] Const. 1963, art. 6, § 23, as amended in 1968.
[4] Numerous other state supreme courts appoint a trial judge or court of appeals judge to sit on the supreme court whenever a justice is not participating in a case (Alaska, Arizona, Connecticut, Hawaii, Georgia, Kansas, Louisiana, Maryland, Ohio, South Carolina, Utah, Vermont, Virginia, West Virginia, and Wyoming), or when a case is evenly divided due to a recusal (Florida, Missouri, Oklahoma, South Dakota, and Texas), or when more than one justice recuses himself or herself there would not otherwise be a quorum of justices to sit on the case (Maine, Minnesota, Mississippi, New Jersey, New York, New Hampshire, New York, and Rhode Island), or when there is a constitutional issue in the case (Nebraska).
[5] Canon 2(A) provides:

Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.
[6] Cain v. Dep't of Corrections, 451 Mich. 470, 509 n. 45, 548 N.W.2d 210 (1996).
[7] Cain, supra, at 513 n. 48, 548 N.W.2d 210.
[8] See Garwin (ed.), Annotated Model Code of Judicial Conduct (ABA Center for Professional Responsibility, 2004).
[9] See McKeown, Don't shoot the canons: Maintaining the appearance of propriety standard, 7 J. App. Prac. & Process 45, 47 (2005).
[10] Model Code, Canon 2.
[11] Id., Canon 3(E).
[12] Federal Ninth Circuit Court of Appeals.
[13] McKeown, supra at 48-49.
[14] Id. at 52-53 (citation omitted).
[15] Webster's New World Dictionary (3rd college ed.) defining "vitiate."
[16] MCR 2.003(D) (emphasis added).
[17] Id. (emphasis added).
[18] MCR 2.003(C)(3)(a) and (b) provide that when a challenged judge denies the motion, in courts having two or more judges, "on the request of a party, the challenged judge shall refer the motion to the chief judge, who shall decide the motion de novo ... [or] in a single-judge court, or if the challenged judge is the chief judge, ... the challenged judge shall refer the motion to the state court administrator for assignment to another judge, who shall decide the motion de novo."
[19] See Gilbert v. DaimlerChrysler Corp., 470 Mich. 749, 685 N.W.2d 391 (2004), reh. den. 472 Mich. 1201, 691 N.W.2d 436 (2005), in which a party's request to have the decisions of justices to participate in the case reviewed consistently with the procedure required by MCR 2.003(C)(3) was ignored. 469 Mich. 883, 669 N.W.2d 265 (2003) (recusal motion denied.)
[20] Art. 6, § 6 of the 1963 Michigan Constitution states, in full:

Decisions of the supreme court, including all decisions on prerogative writs, shall be in writing and shall contain a concise statement of the facts and reasons for each decision and reasons for each denial of leave to appeal. When a judge dissents in whole or in part he shall give in writing the reasons for his dissent.
[21] In In re JK, 468 Mich. 1239, 663 N.W.2d 918 (2003), my participation in a case became an issue, which led me to research the procedures governing the participation and disqualification of justices. Since then, I have repeatedly called for this Court to address the question. See, e.g., Graves v. Warner Bros., 469 Mich. 853, 854, 669 N.W.2d 552 (2003); Gilbert v. DaimlerChrysler Corp., 469 Mich. 883, 669 N.W.2d 265 (2003); Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n, 472 Mich. 91, 96, 693 N.W.2d 358 (2005); Grievance Administrator v. Fieger, 472 Mich. 1244, 1245, 696 N.W.2d 703 (2005); Scalise v. Boy Scouts of America, 473 Mich. 853, 700 N.W.2d 360 (2005); McDowell v. Detroit, 474 Mich. 999, 708 N.W.2d 104 (2006), and Stamplis v. St. John Health Sys., 474 Mich. 1017, 708 N.W.2d 377 (2006).
[22] See ADM 2003-26.
[23] The dates of the eight public hearings held on other administrative matters since May 2003 are: September 23, 2003, January 29, 2004, May 27, 2004, September 15, 2004, January 27, 2005, May 26, 2005, September 29, 2005, and January 25, 2006.
[1] I note that, like Justice Young, I agree with their legal analysis of the ethical issues raised.
[2] The ethics term "Chinese Wall" refers to a mechanism for screening judges or attorneys from a particular matter to prevent conflicts of interest. See Black's Law Dictionary (7th ed.).