*530 CORRIGAN, J.
(concurring in the opinion of YOUNG, J.). I join Justice YOUNG’s opinion in full. I write separately in order to discuss additional issues raised by this appeal that I believe the trial court should consider on remand before again certifying a class in this case. The trial court’s October 21, 2005, opinion and order granting class certification formally defined the class to include “all persons who owned real property within the one-hundred year Flood Plain of the Tittabawassee River in Saginaw County, Michigan, on February 1, 2002.” The class definition also included a geographic description of the relevant flood plain. But the definition did not limit the class to those property owners who are actually injured by pollution emanating from the activities of defendant, Dow Chemical Company. Rather, the order defined the class broadly to include all of the approximately 2,000 persons who owned property on approximately 13,000 acres of land. I conclude that such an indiscriminate, overbroad definition of the class failed to comport either with MCR 3.501 or with the precedent cited in the trial court’s order because it included numerous class members with no present injuries.
Further, such an overbroad class definition would be likely to have significant, negative effects on the hundreds of purported class members who indeed may have no present injuries. It is striking that only about 170 landowners had elected to join this suit as plaintiffs at the time of the trial court’s certification decision.[1] The *531 owners of property with no present injuries may reasonably wish not to be included in the class because certification of their otherwise unharmed property may itself guarantee reduction in their property values; these landowners will never recover against Dow because they cannot allege damages under negligence or nuisance theories, but their property values may collapse further simply as a result of their being lumped into the class.
For this reason, if the trial court on remand again concludes that certification of a class is proper, I would direct the court to limit the class to those property owners with actual injuries as a result of Dow’s activities.

THE ACTUAL INJURY REQUIREMENT

It is axiomatic that each member of a plaintiff class must have suffered an actionable injury, which is a prerequisite of any tort claim. “[C]lass members must have suffered actual injury to have standing to sue....” Zine v Chrysler Corp, 236 Mich App 261, 288; 600 NW2d 384 (1999). As the United States Supreme Court opined in Gen Tel Co of the Southwest v Falcon, 457 US 147, 156; 102 S Ct 2364; 72 L Ed 2d 740 (1982): “We have repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.” (Emphasis added; citation and quotation marks omitted.) Michigan cases similarly require plaintiffs to “demonstrate with common proof that the members of the class have suffered a common injury.” A & M Supply Co v Microsoft Corp, 252 Mich App 580, 599-600; 654 NW2d 572 (2002) (emphasis added).
Likewise, the federal toxic tort cases relied on by plaintiffs and the trial court involved certification of classes explicitly defined by reference to the members’ *532 present injuries. For example, the discussion in Sterling v Velsicol Chem Corp, 855 F2d 1188, 1197 (CA 6, 1988), which the trial court quoted at length in its October 21, 2005, order, addressed a class of residents who alleged that they “suffered damages as a result of ingesting or otherwise using. . . contaminated water.” Sterling involved plaintiffs who lived near a landfill from which toxic chemicals seeped into the ground, contaminating soil and groundwater. Much as in the present case, because several wells near the site tested positive for contamination, all residents within 1,000 acres of the site were advised to stop using their wells for any purpose. Several residents sued under theories including nuisance and negligence. Id. at 1192-1194. The United States Court of Appeals for the Sixth Circuit affirmed class certification. But the class did not indiscriminately include every resident within the 1,000-acre area; rather, Sterling’s discussion and holding presuppose that each class member had a present injury because “each class member lived in the vicinity of the landfill and allegedly suffered damages as a result of ingesting or otherwise using the contaminated water.” Id. at 1197 (emphasis added). Similarly, the class in Olden v Lafarge Corp, 383 F3d 495, 507 (CA 6, 2004), was expressly defined as “all owners of single family residences in the City of Alpena whose persons or property was damaged by toxic pollutants and contaminants which originated from the Lafarge cement manufacturing facility. .. .” (Emphasis added.) In contrast, as noted, the class certified here broadly included “all persons who owned real property” within the 100-year flood plain, without reference to whether such persons could allege harm as a result of Dow’s activities. Because it is apparent that such an overbroad class cannot all allege cognizable claims, I conclude that plaintiffs’ proposed class definition is flawed.

*533
PRESENT INJURIES UNDER THE TORTS ALLEGED

Plaintiffs sued under negligence and nuisance theories. To prove negligence, “a plaintiff must demonstrate a present physical injury to person or property in addition to economic losses that result from that injury.” Henry v Dow Chem Co, 473 Mich 63, 75-76; 701 NW2d 684 (2005) {Henry I) (emphasis in original). Henry I created a bright line rule by unambiguously requiring a plaintiff alleging negligence to prove present physical injury. Here, plaintiffs cannot show that each land parcel in the 100-year flood plain is presently contaminated with pollution alleged to have originated from Dow’s activities. Indeed, studies by the Michigan Department of Environmental Quality (DEQ) expressly show that some of the land is not contaminated. Because the owners of uncontaminated property do not have present physical injuries, they cannot allege negligence under Michigan law.
Accordingly, plaintiffs argue that even the uncontaminated properties suffer present injury in fact under a nuisance theory because they may become contaminated in the future. But Dow correctly argues that the purported injury in fact to many of these properties is too speculative to be recognized in Michigan.
To prove private nuisance, a plaintiff must show substantial interference with the use and enjoyment of his land. Adkins v Thomas Solvent Co, 440 Mich 293, 303-304; 487 NW2d 715 (1992).[2] Because a nuisance is a “nontrespassory invasion,” a plaintiff need not show physical intrusion upon his land to prove nuisance. Id. at 302.
*534 There are countless ways to interfere with the use and enjoyment of land including interference with the physical condition of the land itself, disturbance in the comfort or conveniences of the occupant including his peace of mind, and threat of future injury that is a present menace and interference with enjoyment. [Id. at 303.]
Significantly, although nuisance may involve “ ‘threatening or impending danger,’ ” id., quoting Kilts v Kent Co Supervisors, 162 Mich 646, 651; 127 NW 821 (1910), a plaintiff cannot prove nuisance “where damage and injury are both predicated on unfounded fear of third parties that depreciates property values,” id. at 312. “[Pjroperty depreciation alone is insufficient to constitute a nuisance.” Id. at 311.
Here, the facts presented by plaintiffs do not suggest that all or even most of the 2,000 proposed class members can allege cognizable nuisance claims. As noted, the DEQ reports that many parcels of land are not physically contaminated. Many more parcels have not even been tested, were never subject to flooding, and are very unlikely to experience flooding even during the next century. Crucially, the DEQ’s restrictions apply only to contaminated or frequently flooded land — not to all land in the 100-year flood plain.[3] Because the class *535 was defined on the sole basis of the geographic boundaries of the 100-year flood plain, much of the circumscribed land has only a one percent chance of flooding in a given year. See ante at 514 n 1 (YOUNG, J.). Moreover, the degree of risk of contamination from future flooding is questionable and somewhat speculative; Dow has already altered its activities and begun remediating past contamination of the river as was required, in part, by the DEQ.[4]
Accordingly, although some landowners may be able to allege present harm from nuisance, many residents of the flood plain certainly cannot. Indeed, the land that is not presently contaminated, that has a low risk of flooding in the future, and that has a largely speculative risk of actual contamination as a result of future flooding, is comparable to the land in Adkins where the plaintiffs sought damages based on diminished property values they alleged were caused by contamination in the surrounding area. These plaintiffs’ land was not actually contaminated; a groundwater divide prevented the migration of toxic chemicals from the surrounding land. Adkins, 440 Mich at 299-300, 318. The Court held that fear-based diminution in property values was an insufficient basis for relief, stating:
Under such a theory, a cause of action could be stated on behalf of any individual who could demonstrate an effect on property values even if the polluted ground water had *536 neither strayed from defendants’ own property, nor disturbed a plaintiffs enjoyment by the fear that it would do so.
If any property owner in the vicinity of the numerous hazardous waste sites that have been identified can advance a claim seeking damages when unfounded public fears of exposure cause property depreciation, the ultimate effect might be a reordering of a polluter’s resources for the benefit of persons who have suffered no cognizable harm at the expense of those claimants who have been subjected to a substantial and unreasonable interference in the use and enjoyment of property. [Id. at 318-319.]
The very problem identified in Adkins is present here. Plaintiffs argue that property values throughout the flood plain have been diminished in part as a result of DEQ warnings to residents concerning possible contamination and steps residents should take to avoid harmful exposure to dioxin-contaminated soil; residents were told, for example, that children and gardeners should avoid prolonged exposure to contaminated soil and that certain steps were required if residents wished to move or dispose of such soil. But the DEQ itself also reported that various areas of the flood plain were not harmfully contaminated, and the state-promulgated restrictions applied only to contaminated or, at most, frequently flooded land. Indeed, the depositions of some flood plain residents explicitly revealed that these residents were not directly affected by pollution and had not altered the use of their land in any way as a result of Dow’s alleged polluting activities. Thus, many proposed class members would be able to argue at most that their property values decreased simply as a result of publicity concerning pollution of the Tittabawassee River in part due to this lawsuit. But this is precisely the sort of unfounded fear that the Adkins Court concluded could not underlie a nuisance claim. *537 Finally, the 170 or so plaintiffs who moved for class certification risk the very problem identified in Adkins-, by attempting to certify 2,000 class members, most of whom obviously had not yet chosen to participate in the suit and many of whom may not be able to allege damages from present injuries, the plaintiffs virtually guarantee both that Dow’s resources will be stretched to defend uncognizable claims at the expense of those plaintiffs who suffer actual harm and that any fear-based diminution in property values throughout the flood plain will accelerate as a result of the overbroad class definition.[5] Indeed, not only does the proposed class definition incorrectly suggest that undamaged land is indeed damaged in some way, but the definition likely would suspend all flood plain residents’ abilities to sell undamaged land throughout the pendency of this suit, which is already over six years old.

CONCLUSION

For these reasons, I conclude that the class proposed by plaintiffs is too broad and therefore is untenable. Significantly, it is not even clear that the trial court intended to accept plaintiffs’ broad proposed definition when it initially certified the class. I note that the October 21, 2005, order refers to two defining characteristics of the class, one largely geographic but the other apparently based on present injury: “Each member of the class lives in the area alleged to have been damaged. Each member of the class allegedly suffered damages as a result of the release of contaminates in *538 the Tittabawassee River.” (Emphasis added.) Accordingly, if the trial court again concludes on remand that class certification is appropriate, I would direct the court to explicitly limit any class definition to property owners who suffer present injuries.
MARKMAN, J., concurred with CORRIGAN, J.
WEAVER, J.
I write this separate opinion with regard to the issue of my participation in this case.
In preparation of my 2008 income taxes, it came to my attention that I own 108 shares of Dow Chemical, which I received through a recent inheritance. After I became aware of this information, I asked the Clerk of the Court, Corbin Davis, to notify the parties to this case. Below is a copy of the disclosure statement sent to the parties by Mr. Davis on April 15, 2009:
Justice Weaver has requested that I inform you of the following:
In preparation of her 2008 income taxes, it has come to Justice Weaver’s attention that she now owns 108 shares in Dow Chemical, which she received through a recent inheritance. Justice Weaver has informed me that she did not own any Dow Chemical stock at the time she sat on this matter in a prior appeal. Henry v Dow Chemical Co, 473 Mich 63; 701 NW2d 684 (2005).
She has been informed that this stock is currently worth approximately $10.94 per share, thus making the total value of her stock $1,181.52. Pursuant to the Code of Judicial Conduct Canon 3(C):
“A judge should raise the issue of disqualification whenever the judge has cause to believe that grounds for disqualification may exist under MCR 2.003(B).”
MCR 2.003(B)(5) provides in part that a judge is disqualified when:
*539 “The judge knows that he or she .. . has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding.”
Justice Weaver believes that the amount of stock she owns in Dow Chemical is not a “more than de minimis interest” that could be substantially affected by this proceeding.
She also states that she has no personal bias or prejudice for or against either party and, therefore, finds no need to recuse herself in this case. However, should either of the parties desire that she recuse herself, she is willing to do so.
Please advise me of your preference in this matter at your earliest convenience.
Justice YOUNG also sent a separate statement to the parties expressing his disagreement with my decision to notify the parties in this manner. Both parties responded that they had no objection to my continued participation in this case.
I bring this issue to the public’s attention because it is another example of why this Court needs fair, clear, written rules for disqualification concerning the participation or nonparticipation of Michigan Supreme Court justices. Since May 2003, I have repeatedly called for this Court to recognize, publish for public comment, place on a public hearing agenda, and address the need to have written, clear, fair, orderly, and public procedures concerning the participation or disqualification of justices.[1] See, e.g., the statement or opinion by WEAVER, J., *540 in In re JK, 468 Mich 202, 219-225; 661 NW2d 216 (2003); Gilbert v DaimlerChrysler Corp, 469 Mich 883 (2003); Advocacy Org for Patients & Providers v Auto Club Ins Ass’n, 472 Mich 91, 96-104; 693 NW2d 358 (2005); McDowell v Detroit, 474 Mich 999, 1000 (2006); Stamplis v St John Health Sys, 474 Mich 1017, 1017-1018 (2006); Heikkila v North Star Trucking, Inc, 474 Mich 1080, 1081 (2006); Lewis v St John Hosp, 474 Mich 1089, 1089-1090 (2006); Adair v Michigan, 474 Mich 1027, 1044-1051 (2006); Grievance Administrator v Fieger, 476 Mich 231, 328-347; 719 NW2d 123 (2006); Grievance Administrator v Fieger, 477 Mich 1228, 1231-1271 (2006); People v Parsons, 728 NW2d 62, 62-65 (2007); Ruiz v Clara’s Parlor, Inc, 477 Mich 1044 (2007); Neal v Dep’t of Corrections, 477 Mich 1049, 1049-1053 (2007); State Auto Mut Ins Co v Fieger, 477 Mich 1068, 1070-1071 (2007); Ansari v Gold, 477 Mich 1076, 1077-1079 (2007); Short v Antonini, 729 NW2d 218, 219-220 (2007); Flemister v Traveling Med Services, PC, 729 NW2d 222, 223-225 (2007); McDowell v Detroit, 477 Mich 1079, 1084-1086 (2007); Johnson v Henry Ford Hosp, 477 Mich 1098, 1099-1100 (2007); Tate v Dearborn, 477 Mich 1101, 1102-1103 (2007); Dep’t of Labor & Economic Growth v Jordan, 480 Mich 869, 869-873 (2007); Cooper v Auto Club Ins Ass’n, 739 *541 NW2d 631, 631-633 (2007); and Citizens Protecting Michigan’s Constitution v Secretary of State, 482 Mich 960, 962-964 (2008).
YOUNG, J.
I write separately to respond to Justice WEAVER’S separate opinion.
It would appear from Justice WEAVER’S separate opinion that I opposed the communication of her late-discovered ownership interest in one of the parties. She states: “Justice YOUNG also sent a separate statement to the parties expressing his disagreement with my decision to notify the parties in this manner.” Ante at 539 (emphasis added). This is patently untrue, as Justice WEAVER knows. What I challenged was the inadequacy of her disclosure to the parties concerning the nature of her ownership of stock in Dow Chemical. For example, she did not disclose when she actually became the legal owner of stock in Dow Chemical or precisely when she discovered she had this ownership interest. Moreover, she did not disclose the basis for her unilateral determination that her ownership interest is not a “more than de minimis interest” or why any ownership interest was not itself disqualifying. In order to ensure that the context of my criticism of her disclosure is provided, I am publishing my own communication to the parties below.
I continue to question Justice Weaver’s participation in this case.[1]1 believe that any ownership interest in a *542 party precludes a judge’s participation. MCR 2.003(B)(5) provides that a judge, is disqualified when “[t]he judge knows that... she ... has an economic interest in ... a party to the proceeding or has any other more than a de minimis interest that could be substantially affected by the proceeding.” This court rule is written in the disjunctive, which distinguishes an economic interest in a party from every other type of potentially disqualifying interest. Only those “other” types of interests contain an exception for de minimis interests. Without doubt, Justice WEAVER has an “economic interest in... a party” in this proceeding.
This qualitative distinction made in MCR 2.003(B)(5) between economic interests and other interests is similarly found in the nearly identical federal statute regarding judicial recusal.[2] 28 USC 455(b)(4) disqualifies a federal judge from sitting in a case if he or she “has a financial interest in the subject matter in controversy . . . .” The statute defines “financial interest” as “ownership of a legal or equitable interest, however small.” 28 USC 455(d)(4). The United States Court of Appeals for the Tenth Circuit has determined that the federal statutory scheme
*543 differentiates between two kinds of interests. If the judge has direct ownership, legal or equitable, then disqualification is required regardless of the size of the interest, unless one of the specified exceptions applies. On the other hand, an interest not entailing direct ownership falls under “other interest,” and requires disqualification only if the litigation could substantially affect it.[3]
Furthermore, the leading commentators on federal practice and procedure indicate that this statutory provision
eliminate[s] any dispute about the substantiality of a financial interest. If a judge, or any other person within the statutory language, has any financial interest, as that term is defined, however small, in a party or in the subject matter in controversy, the judge must recuse. There is no room for discretion.[4]
Under MCR 2.003(B)(5) there was no discretion here for Justice Weaver’s continued participation.
MY STATEMENT TO THE PARTIES
My response, also communicated to the parties, challenging Justice Weaver’s disclosure to the parties concerning her stock ownership is restated here as follows:[5]
In light of her repeated public statements regarding standards for recusal, I regret that Justice Weaver has placed the parties in the awkward position of having to decide whether she will take part in the decision of this *544 case notwithstanding her acknowledged financial interest as an investor in the defendant corporation. I ask that the following public information regarding Justice Weaver’s stated positions on recusal be taken into consideration in making a decision on her request for remittal.
While I have publicly supported the Court’s more than a century old recusal policy,[2] Justice Weaver has been equally publicly criticad of that longstanding policy in suggesting that she subscribes to a “higher” standard.[3]
Nevertheless, Justice Weaver claims that her ownership of approximately $1,200 in defendant Dow’s stock is “not a ‘more than de minimis interest.’ ” She has made this determination herself, which is contrary to her repeated public statements on the question of judicial recusal.[4]
For example, in this Court’s March 18, 2009 order on ADM 2009-04 (Proposed Disqualification Rules for Justices), Justice Weaver reiterated her 2006 statement on disqualification and explained that “ [i]t is a most basic truth that the person who may be the least capable of recognizing a justice’s actual bias and prejudice, or appearance of bias and prejudice, is the justice h[er]self.”[5] Presumably consistent with that sentiment, she recused herself in Kyser v Kasson Twp, “because she has a past and current business relationship with Kasson Township Supervisor Fred Lanham and his family.”[6]
Moreover, Justice Weaver has advocated a disqualification standard that requires judges to recuse themselves if there is merely an appearance of impropriety. She has cited with approval Canon 2 of the ADA Model Code of Judicial Conduct, which states that “[a] judge shall avoid. .. the appearance of impropriety in all of the judge’s activities” and Model Canon 3(E)(1), which states that a judge “shall disqualify ... herself in a proceeding in which the judge’s impartiality might reasonably be questioned.”[7]
The disqualification standard that she has publicly championed is an objective standard, not a subjective standard to be determined by her say-so. Justice Weaver’s “appearance of impropriety” standard is made without *545 regard to whether an individual judge harbors an actual bias toward any party in the case being heard:
“[W]hen a judge recuses ... herself to avoid the appearance of impropriety, the result is that the judge avoids risking actual bias. Second, when a judge recuses... herself, the judge eliminates the appearance of impropriety and thereby engenders public confidence in the judiciary.”[8]
Accordingly, if her support of the “appearance of impropriety” standard is genuine &emdash; and I assume that she would not have advocated it otherwise &emdash; her personal belief that she “has no personal bias or prejudice for or against either party” and that the total value of her stock is “not more than a de minimis interest” is irrelevant to whether she must recuse herself.
Moreover, Justice Weaver has advocated in her various published statements on disqualification standards that the disqualification decision cannot be solely vested in the judge who is the subject of disqualification but must be reviewed by other members of the Court.[9]
Here, Justice Weaver has made her own determination that her Dow stock ownership is “de minimis” within the meaning of MCR 2.003(B)(5). But there is no basis upon which an objective observer can assess the validity of her claim and decision. Context is essential in considering what level of ownership in a party litigant is “de minimis,” and no one but Justice Weaver is privy to her financial status - something she has chosen not to share.
My point here is that Justice Weaver’s request for remission is entirely inconsistent with her published views on what standards ought apply in recusal situations. Her ownership of stock in a party defendant does pose an appearance of impropriety from the standpoint of the public.[10] Can anyone imagine the public at large believing that it is perfectly appropriate for a judge to decide a case in which she owns stock in one of the parties?[11] Moreover, her communication - which states her conflict, announces that her conflict does not matter, and asks the parties to agree with her - is inherently intimidating and coercive to both parties involved in this litigation.[12] Rejection of her *546 stated premise — that, notwithstanding her stated conflict, she should participate in the case — obviously puts the parties in the position of offending a sitting Justice. By her own stated positions on recusal, she should not be putting the parties in the position of having to bless an appearance of impropriety
Finally, the nature of Justice Weaver’s private communication with the parties does not comport with her conclusion that the Michigan Constitution, art 6, § 6, “requires that a justice’s self-initiated decision and reasons not to participate, or a challenged justice’s decision and reasons to participate or not participate, should be in writing and accessible to the public.”[13] It would seem to me that, under her proposed regime, Justice Weaver’s discussion of her stock ownership should be published for public review
Again, I wish to state that I believe that our historic disqualification policy is constitutionally sound and should be embraced by all members of this Court. Since it has not been, and since Justice Weaver has articulated her own, purportedly “higher” recusal standards, I am left to wonder why Justice Weaver advocates a public position contrary to the position she practices and why she believes it appropriate that the parties should be asked to bless her conflict.

 Indeed, although I agree with Justice Young that the trial court should reconsider whether the proposed class satisfied each criterion for class certification on the question of Dow’s liability, I agree with the majority that the record presents particularly problematic unanswered questions concerning whether the representative plaintiffs’ claims are typical of those of the proposed class, MCR 3.501(A)(1)(c), and whether plaintiffs will “fairly and adequately assert and protect the interests of the class” as class representatives, MCR 3.501(A)(1)(d). See ante at 506-507.

 Public nuisance, on the other hand, requires proof of an “unreasonable interference with a right common to all members of the general public.” Adkins, 440 Mich at 304 n 8. Plaintiffs alleged both public and private nuisance theories.

 The March 15, 2004, declaration of Andrew W Hogarth, chief of the DEQ’s Remediation and Redevelopment Division, specifies that only “locations where dioxin concentrations exceed the residential direct contact criteria” are a designated “facility” for purposes of state restrictions on contaminated land, which include the requirement to inform potential buyers of dioxin contamination. He states that the DEQ also “believes” that property “subject to frequent flooding by the Tittabawassee River downstream of Midland is a facility.” He avers that residents were specifically informed of these definitions in the DEQ’s June 2003 Information Bulletin No. 3. As Dow observes, there is no evidence to suggest that uncontaminated property with a low likelihood of flooding in a given year is “subject to frequent flooding” or otherwise designated a “facility” by the DEQ’s terms. Similarly, the DEQ’s Information Bulletin No. 4, dated March 2004, identified precautions that residents of the *535 flood plain could take “to reduce exposure to dioxins from the identified areas of contamination.” (Emphasis added.) By their terms, these guidelines do not apply to uncontaminated soil.

 I also note, as the DEQ observed in its June 2003, Phase II Final Report, the presence of uncontaminated properties within the 100-year flood plain that are elevated above the flood level as a result of “local natural features or the introduction of clean fill material.” Obviously these properties also have a low risk of future contamination from flooding.

 Dow posits that the 100-year flood plain is too broad an area for a fact-finder to conclude that every owner suffers a present, nonspeculative injury sounding in nuisance. Dow reasonably asks: why not the 1,000-year or 1-million-year flood plain? Conversely, plaintiffs would be more likely to properly define a geographically based class if they focused merely on the 10- or 20-year flood plain.

 Justice Young now asserts that he feels an “ethical obligation” to raise questions about the manner in which I have handled the issue of my participation in this matter. Post at 541 n 1. However, I again note that since 2003,1 have raised the issue of the need for clear, written, and fair disqualification rules for Michigan Supreme Court justices, but the “majority of four” (Justice Young, along with Justices Corrigan and *540 Markman and former Chief Justice Taylor) refused to address the issue until 2006, when this Court worked on the issue of disqualification, and the “majority of four” refused to publish the proposed disqualification rules formulated by members of this Court.
In March of this year (2009), after former Chief Justice Taylor’s removal from this Court as a result of his overwhelming defeat in the 2008 election, the “remaining three” (Justice Young, along with Justices Corrigan and Markman) voted against publishing proposed rules for disqualification. Fortunately, this year, a majority voted in March 2009 to publish for public comment until August 1, 2009, the three proposals for rules of disqualification to be considered at a public hearing later in 2009.

 While, consistent with my previous practice, Adair v Michigan, 474 Mich 1027, 1052 (2006) (statement of Young, J.), I do not “vote” on Justice Weaver’s disqualification in this case, I believe I do have an ethical obligation to raise questions about her decision. I note that, contrary to their participation in United States Fidelity & Guaranty Co v Michigan Catastrophic Claims Ass’n, 484 Mich 45, 47; 773 NW2d 243 (2009), where the Chief Justice and Justice Cavanagh concurred in and signed Justice Hathaway’s decision to participate, here they have not joined in *542 Justice Weaver’s decision to participate. I have no idea why these justices have chosen to vote on the disqualification in the one case but have declined to do so in this instance.

 Compare 28 USC 455(b)(4), which provides that a judge shall disqualify himself when “[h]e knows that he ... has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding,” with MCR 2.003(B)(5), which provides that a judge is disqualified when “[t]he judge knows that he... has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding.” The federal statute was enacted in 1948 and the Michigan court rule was amended in 1995 in light of the 1990 ABA Model Code of Judicial Conduct, which, in pertinent part, was taken from the federal statute.

 In re New Mexico Natural Gas Antitrust Litigation, 620 F2d 794, 796 (CA 10, 1980). This is the same distinction made in MCR 2.003(B)(5).

 Wright and Miller, 13D Federal Practice and Procedure (3d ed), § 3546, pp 76-78 (emphasis in original; citations omitted).

 My communication to the parties begins with endnote 2 because Justice Weaver’s communication contained one citation and the citations were numbered continuously. Additionally, all citations in the communication have been converted to this Court’s standard format.

 *546 “In short, a justice confronted with a disqualification motion has typically consulted with members of the Court and made a determination whether participation in a particular matter was appropriate. Other than providing counsel, other members of the Court have not participated in the decision.” ADM 2009-04, order of the Michigan Supreme Court, March 18, 2009, p 33 (“March 18, 2009 order”) (statement of Young, J.). See also Adair v State of Michigan, 474 Mich 1027, 1052 [2006] (statement of Young, J.).

 *546 See, e.g, March 18, 2009 order, supra at 9 n 1 (statement of Weaver, J).

 *546 4 So far as I am aware, Justice Weaver did not consult with any member of this Court before announcing her position.

 *547 5 March 18, 2009 order, supra at 14.

 *547 6 Kyser v Kasson Twp [483 Mich 903 (2009) (order denying leave)] and [483 Mich 983 (2009) (order vacating denial order and granting leave)]. Justice Weaver did not disclose the nature of her “business relationship” that warranted her recusal.

 *547 7 See Adair v State of Michigan, 474 Mich 1027, 1047 (2006) (statement of Weaver, J.). Justice Weaver does not subscribe to my view that, because Justices cannot be replaced on a case by case basis, a different rule of disqualification must apply to Justices. See id. at 1044-1045. On the contrary, she advocates that a disqualified Justice can be replaced in such a case.

 *547 8 Id. (Emphases added.) Justice Weaver claims that she “has no personal bias or prejudice for or against either party....” Nevertheless, her lack of actual bias in this case is irrelevant under her disqualification standard to the question whether the participation of a judge who has an ownership interest in a litigant creates an appearance of impropriety.

 *547 9 March 18, 2009 order, supra at 13-14. This, of course, is one of the issues pending in Caperton v Massey, United States Supreme Court Docket No. 08-22, where it is claimed that due process requires that a recusal issue must be decided by someone other than the judge who is the subject of potential disqualification.

 Indeed, Congress has made this very policy judgment. 28 USC 455(b)(4) disqualifies a federal judge from sitting in a case if he or she “has a financial interest in the subject matter in controversy.” The statute defines “financial interest” as “ownership of a legal or equitable interest, however small.” 28 USC 455(d)(4). While this federal statute is not controlling here as our disqualification rule for Michigan judges permits a “de minimis” financial interest, it does provide support for the proposition that even a small financial stake in a party litigant creates an appearance of impropriety.

 As stated, Justice Weaver provides the parties with no basis upon which to evaluate her request for remission.

 *548 I am aware that this procedure is specifically contemplated by MCR 2.003(D). Nevertheless, if Justice Weaver’s standard for recusal is the appearance of impropriety, then submitting this question to the parties becomes moot and is inherently aimed at coercing the parties to accept her participation notwithstanding the appearance of impropriety.

 *548 13 Adair, 474 Mich at 1050 (statement of Weaver, J.) (emphasis added).