*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

EDIE TAYLOR,

        Plaintiff-Appellant,

v

MCKEEN and ASSOCIATES, PC,

        Defendant-Appellee.

UNPUBLISHED
August 12, 2021

No. 352902
Wayne Circuit Court
LC No. 16-016479-NM

Before: SAWYER, P.J., and BOONSTRA and RICK, JJ.

PER CURIAM.

Plaintiff appeals by right the trial court's order granting defendant's motion for involuntary dismissal. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This legal malpractice action arises out of plaintiff's earlier, unsuccessful, medical malpractice action. In 2009, plaintiff underwent surgery at Mackinaw Surgery Center. In 2011, plaintiff retained defendant to represent her in a medical malpractice action against the nurse anesthetist who was responsible for her anesthesia, as well as several corporate defendants. Ultimately, the trial court in that case granted summary disposition in favor of the defendants. The facts of the underlying the medical malpractice case were summarized by this Court in plaintiff's appeal of that matter:

> Taylor's out-patient hemorrhoid surgery was performed on September 28, 2009. McCarthy recounted at her deposition that her initial attempt to intubate Taylor failed because she was unable to fully visualize Taylor's vocal cords. With assistance from the attending anesthesiologist, Dr. Craig Bonhoff[1], McCarthy repositioned Taylor's head while Dr. Bonhoff applied cricoid pressure. These maneuvers brought Taylor's vocal cords into better view. McCarthy then bent the

---

[1] It appears that the proper spelling is "Bohnhoff."

-1-

endotracheal tube into a "hockey stick" configuration, which allowed her to pass it into Taylor's trachea. During the surgery, McCarthy noted blood in the endotracheal tube. After she extubated Taylor, McCarthy observed blood in Taylor's suctioned secretions.

Taylor testified that when she awoke from the anesthesia, her mouth was "sore and painful" and felt worse than her rectum. At home, she had difficulty eating and opening and closing her mouth. Taylor could see abnormal areas inside of her mouth she described as "scrapings."

On October 8, 10 days after the operation, Taylor's general surgeon performed a routine postsurgical checkup. Taylor told him of her mouth pain. The surgeon's note states: "She did sustain some perioral lacerations. Examination of the oral cavity today does not reveal any large abscess. There are some small scrapings internally."

On October 13, Taylor went to an emergency room complaining of jaw pain. The emergency room record provides: "had surgery in sept and ever since has had pain in mouth, states something 'poked her mouth when she was put under' now jaw hurts and has headache[.]" A physician's note indicates: "in the right lower jaw she has a wisdom tooth that is coming and irregular. . . . I do not believe this problem is related to endotracheal intubation. [I] believe this is a dental problem."

On October 15, Taylor visited a dentist who diagnosed her problem as a "canker sore," but the next day determined that alveolar bone was exposed in an area near her tongue. Taylor then consulted an oral surgeon, Dr. Reynold J. Baumstark. Dr. Baumstark confirmed the presence of exposed bone in her right mandible, near a wisdom tooth. The wisdom tooth was impacted and infected, and Dr. Baumstark recommended its removal.

Apparently Taylor did not have the money for the extraction. On October 21, she returned to the emergency room complaining of "severe throbbing" right jaw pain. A CT scan obtained that day revealed a small fracture of the tongue-side of the right mandible "at the region of the last molar." Dr. Baumstark removed the impacted wisdom tooth. Unfortunately, Taylor required an additional operation to remove a retained bone fragment. She also developed an infection near the operative site as well as "temporomandibular joint pain." Both conditions necessitated additional treatment.

Taylor's complaint alleges that McCarthy fractured Taylor's jaw during the intubation. According to Taylor's complaint, "[a]s a consequence of [McCarthy's] negligence, [Taylor] required multiple surgeries to repair the fracture and developed a significant infection requiring multiple hospitalizations and a prolonged course of intravenous antibiotics, as well as the sequelae therefrom. . . ." An affidavit of merit signed by Charles Barton, CRNA, avers that McCarthy used

"excessive and/or inordinate force" when intubating Taylor, "which caused a fracture to the patient's mandible."

The parties obtained depositions of most of the physicians and dentists who treated Taylor. Although Dr. Baumstark conceded that the exposed alveolar bone "could be consistent with an injury received during intubation," he offered no opinion regarding the cause of Taylor's jaw fracture. Further, he declined to state "within a reasonable degree of medical certainty or probability" that the intubation had actually caused the exposed bone. Another treating dentist agreed that a jaw fracture should not occur during intubation "in the absence of negligence." The dentist offered no opinion regarding the cause of Taylor's fracture, or the relationship of the fracture to her other jaw-related problems.

Barton testified that in his view, Taylor's mandible fractured because McCarthy negligently failed to administer adequate paralytic medication before attempting to pass the endotracheal tube. Taylor's unrelaxed jaw muscle worked as a force opposing McCarthy's intubation efforts, Barton explained. He summarized: "I think the fracture occurred with the lifting of the jaw against the non-paralyzed masseter muscle that's resisting it. And that's why it snaps right at that level where the masseter muscle is and where the last molar is."

Defendants moved for summary disposition pursuant to MCR 2.116(C)(10), contending that Barton was unqualified to provide expert causation testimony and that Taylor had offered no other competent evidence of proximate cause. According to defendants, nurses such as Barton are not permitted to make medical diagnoses, automatically disentitling them to testify regarding the cause of a patient's disease or injury.

Taylor responded that Michigan law permits plaintiffs to establish causation with nonspeculative circumstantial evidence, and that in this case, the evidence pointed directly to the intubation as the cause of Taylor's jaw problems. Taylor further invoked the res ipsa loquitor doctrine. Taylor's brief did not address whether Barton was qualified to testify to proximate cause, and did not cite any of Barton's testimony. During the oral argument, McCarthy's attorney strenuously emphasized that Barton's testimony "simply can't give them causation." Taylor's counsel never addressed this argument.

In a written opinion, the trial court granted defendants' summary disposition motion. The court first noted, "Plaintiff concedes that she has no expert to testify as to causation." The court then rejected Taylor's argument that circumstantial evidence of causation sufficed, citing caselaw generally holding that expert testimony is necessary to establish a medical malpractice claim. Res ipsa loquitor, the court continued, allows a fact finder to infer negligence, but not proximate cause. The trial court concluded: "Leaving a jury of laypeople to speculate, in the absence of expert testimony, that Plaintiff's intubation caused the injuries in question is simply not proper." [*Taylor v McCarthy*, unpublished opinion of the

-3-

Court of Appeals, issued February 3, 2015 (Docket No. 317766), unpub op at 1-3 (footnote omitted).]

Plaintiff, still represented by defendant, appealed the trial court's ruling. This Court affirmed, holding that plaintiff had "failed to preserve this challenge to the trial court's ruling" by failing to cite before the trial court "any testimony offered by Barton in support of her proximate causation claim." *Id*. at 4.

In 2016, plaintiff sued defendant, alleging that defendant had committed legal malpractice by failing to provide competent representation in the medical malpractice case, failing to know the law, and failing to retain a qualified expert witness to testify regarding causation. In 2019, the case was reassigned to a new trial judge. At a November 8, 2019 hearing, plaintiff's counsel orally stated that plaintiff desired that the trial judge recuse himself. While indicating that he had been employed by defendant "sometime between 2008 and 2010," the trial judge denied plaintiff's request, stating:

> I am satisfied that there is no basis for the Court to recuse itself in this, from this case because there's no objective or reasonable perception given the length of time that I've been away from the lawyers, et cetera, to create any type of reasonable perception . . . or objective.

> \* \* \*

> [T]he question is[,] is the Court, is there objective or reasonable perception that would require the Court to recuse itself and I can assure you that, and I hate saying this because it's so obvious, I can assure you that the Court is going to be fair to the parties, that the parties interest and justice being accomplished is going to take place.

> I'm not going to favor or disfavor the McKeen Law Firm because of my interaction with them over 9 years ago, so for all of these reasons I have to deny your request for recusal.

The chief judge of the trial court upheld the trial judge's denial of plaintiff's request.

The case proceeded to a bench trial. Relevant to this appeal, plaintiff maintained that defendant had committed malpractice by failing to provide expert testimony to establish proximate cause in the underlying medical malpractice case.[2] Plaintiff offered into evidence the de bene esse deposition testimony of Dr. Phillip Arbit, M.D., an anesthesiologist. Dr. Arbit testified that plaintiff's medical records showed that "red blood suction from the posterior pharynx" was performed on plaintiff during her anesthesia, which means "something was scraped in the mouth, or it means there was some type of tissue injury in the mouth, teeth, gums, going backwards down the airway." Dr. Arbit further testified that blood in the posterior pharynx could come from several injuries that could happen when a patient is intubated, including "if you pinch a lip," "irritating the

---

[2] Plaintiff also argued that defendant erred by not naming Dr. Bohnhoff as a defendant.

-4-

gums," "scraping along the inside of the gums with the laryngoscope," "biting down on the tongue," or scraping "the back of the pharynx." According to Dr. Arbit, "[i]t's not common to have blood in the back of the airway and not know where it's coming from." Dr. Arbit testified that, according to their depositions, the nurse anesthetist had informed the anesthesiologist that blood was noted in the patient's pharynx and mouth. Dr. Arbit further testified regarding the post-operative procedures performed on plaintiff that "[e]verything appeared to be normal routine."

Dr. Arbit opined that plaintiff "had an area on the back of her jaw that was . . . scraped, infected and then became necrotic," and that this occurred "when there was blood in the mouth at the time of the laryngoscope, which is not an uncommon event." When asked if he was speculating regarding whether plaintiff was scraped with the laryngoscope, Dr. Arbit responded: "Well, something happened in her mouth that caused it to bleed, right? It wasn't her lips or gums because they would have seen it and looked at it." Dr. Arbit also referred to an article from Harvard Dental School documenting instances in which a laryngoscope scrape during anesthesia had led to infection and bone fracture. Dr. Arbit further opined that "there should have been some form of treatment" when the blood in the pharynx was noted, adding, "My thought process is that had they gotten a dentist involved and had Peridex[3] washing at that time, that it is very possible some of this would not have happened."

Dr. Arbit testified that he did not necessarily consider the scrape itself to be a violation of the applicable standard of care, but believed that more should have been done to treat the injury that resulted, because "this could very easily turn into infection in her mouth that could cause the osteo, which is the infection in the bone, which can lead to a fracture and down a pathway similar to what happened to [plaintiff]." He also opined that Dr. Bohnhoff breached the applicable standard of care by failing to look in plaintiff's mouth after being told there was blood in the airway: "He didn't look and he didn't treat it and he didn't make the appropriate consultation. I think that falls below the standard of care."

When asked for his opinion on proximate cause, Dr. Arbit responded:

I'm going to tell you what a reasonable person would say.

The dentist said that this could have happened bushing [sic] her teeth or chewing a nut. I would as a reasonable person what is more likely for her to do it [sic] biting on a nut and she never felt it, never knew it. Or is it more likely to happen when someone put a metal instrument in her mouth that scraped it and we have blood, and a week later she's complaining of pain. So I think a reasonable person would say yes, this is a proximate cause.

At the close of plaintiff's proofs, defendant moved for involuntary dismissal under MCR 2.504(B)(2). The trial court granted defendant's motion, stating in relevant part:

Okay. Following the Defendant's Motion for a Direct Verdict [sic] on [MCR] 2.504(B)(2) and in consideration of [MCR 2.517] the Court must indicate

___

[3] Peridex is an antibiotic mouthwash.

that of course in order to establish a prima facie case of legal malpractice the Plaintiff must of course prove that the lawyer owed a duty to provide representation within the applicable standard of care for an attorney, that the lawyer breached that duty, and that the lawyer's breach caused an injury or harm to the client.

In the context of a legal malpractice claim against an attorney regarding the handling of a medical malpractice case the Plaintiff must also prove the case within the case.

That is[,] the Plaintiff would have to show by a preponderance of the evidence the professional negligence or malpractice of the physician and/or nurse practitioner . . .

\* \* \*

[Model Civil Jury Instruction] 1501 [15.01] tells us the definition of proximate cause, it indicates, when I use the words proximate cause I mean first that the negligent conduct must have been a cause of the Plaintiff's injury. And second that the Plaintiff's injury must have been of a type that is a natural and probable result of the negligent conduct.

The law indicates further that these elements must be proven by a preponderance of the evidence, not by conjecture or speculation, but by a preponderance of the evidence.

Referring to the testimony of Dr. Arbit that has been discussed here today, specifically Pages 36, 36, and 38 of the trial transcript [,] Dr. Arbit indicates with respect to the issue of proximate causation on Line 3 they, meaning McCarthy and/or Bohnhoff in this case didn't make any followup with any dentist or anybody.

\* \* \*

Based upon the record before the Court, including the evidence that was admitted into evidence here during this trial[,] the Plaintiff's proofs have failed to meet and establish in this case their burden, or Ms. Taylor's burden of proof by a preponderance of the evidence, or stated otherwise more likely than not that the alleged malpractice, that the allegations of medical malpractice cited by Dr. Arbit were a proximate cause of Ms. Taylor's injuries or damages.

Referring to the aforementioned record not only does Dr. Arbit fail to indicate his opinion with a reasonable degree of medical certainty, not only does he fail to state that [it is] more probable than not [that] these injuries in damages would have been avoided with the dental referral and Peridex washing, Dr. Arbit's testimony cannot be shown to support the Plaintiff's burden by a preponderance of the evidence on the necessary proximate causation.

Similarly Dr. Arbit testifies again "Some of this would not have happened" referring to inevitably a reasonable interpretation that some of this would have happened referring to the injuries and damages.

The testimony ["]some of this["] is unclear in terms of what he's referring to. Was it the fact that the mandible wouldn't have been fractured. She would not have needed a PICC line. She would not have lost her impacted tooth. She would not have had pain. She would not have had suffering.

There is really nothing in the record that reveals to this Court what "some of this would not have happened," what that means. There's no explanation and there's no explanation offered, and the Court as factfinder can only speculate as to what he was, he being Dr. Arbit[,] was referring to.

Having failed to meet its [sic] burden, having failed to meet its [sic] burden regarding the proximate causation and present evidence by a preponderance of the evidence the Court really has no recourse under the aforementioned court rules but to find that the Defendant's Motion for a Directed Verdict [sic] must be granted.

Plaintiff subsequently moved for reconsideration, which the trial court denied. This appeal followed.

## II. REQUEST FOR DISQUALIFICATION

Plaintiff argues that the trial judge abused his discretion by denying her request for disqualification, and that the chief judge erred by affirming that denial. We disagree. "When the Court of Appeals reviews a decision on a motion to disqualify a trial court judge, the trial court's findings of fact are reviewed for an abuse of discretion, while the application of the facts to the relevant law is reviewed de novo." *People v Roscoe*, 303 Mich App 633, 647; 846 NW2d 402 (2014) (quotation marks and citation omitted).

A trial judge is presumed to be unbiased, and the party moving for disqualification bears the burden of proving that the motion is justified. MCR 2.003(B); *People v Dixson*, 403 Mich 106, 109; 267 NW2d 423 (1978); *Mitchell v Mitchell*, 296 Mich App 513, 523; 823 NW2d 153 (2012); *Coble v Green*, 271 Mich App 382, 390; 722 NW2d 898 (2006). A judge should be disqualified when he cannot impartially hear a case for any reason, such as when he is biased or prejudiced for or against a party or attorney, when he was employed by a party or lawyer in the case within the preceding two years, when he knows that he or a relative has an economic interest in the matter in controversy that could be substantially impacted by the proceeding, or when there is a serious risk of actual bias or the appearance of impropriety. MCR 2.003(C)(1); *In re MKK*, 286 Mich App 546, 565; 781 NW2d 132 (2009); *Coble*, 271 Mich App at 390; *Armstrong v Ypsilanti Twp*, 248 Mich App 573, 596; 640 NW2d 321 (2001). MCR 2.003(C)(1) provides in relevant part:

Disqualification of a judge is warranted for reasons that include, but are not limited to, the following:

(a) The judge is biased or prejudiced for or against a party or attorney,

(b) The judge, based on objective and reasonable perceptions, has either (i) a serious risk of actual bias impacting the due process rights of a party as enunciated in *Caperton v Massey*, [556 US 868]; 129 S Ct 2252; 173 L Ed 2d 1208 (2009), or (ii) has failed to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.

\* \* \*

(e) The judge was a partner of a party, attorney for a party, or a member of a law firm representing a party within the preceding two years.

In this case, the trial judge was employed by defendant, a party in this case, for some period of time between 2008 and 2010. His employment thus was not within the preceding two years of his involvement in this case. Accordingly, the trial judge was not even arguably required to be disqualified under MCR 2.003(C)(1)(e).

Plaintiff nonetheless argues that the trial judge should have been disqualified out of concern for the appearance of impropriety and the risk of actual bias. A judge should avoid impropriety and the appearance of impropriety in all activities. Michigan Code of Judicial Conduct, Canon 2; see also *Neal v Department Of Corrections*, 490 Mich 906; 804 NW2d 856 (2011). In *Adair v Michigan*, 474 Mich 1027, 1039; 709 NW2d 567 (2006), our Supreme Court set forth a test for determining whether there is an appearance of impropriety. Under MCR 2.003(C)(1)(b), a court should determine whether "the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." *Id*. The appearance of impropriety test "must be assessed in light of what can be gleaned from existing court rules and canons, historical practices and expectations, and common sense." *Id*. The standard requires an objective inquiry "made from the perspective of a reasonable observer who is informed of all the surrounding facts and circumstances." *Id*. This Court, similarly, in *Ireland v Smith¸* 214 Mich App 235, 250; 542 NW2d 344 (1995), mod 451 Mich 457 (1996), stated that "disqualification is merited if there is such a likelihood of an appearance of bias that the judge would be unable to balance the interest of the court with the interests of the affected party." *Id*.

In this case, assessed in the light of the existing court rules and canons, the fact of the trial judge's previous employment with defendant would not have created a perception that the judge's ability to carry out his responsibilities with integrity, impartiality, and competence was impaired. *Adair¸* 474 Mich at 1039. The "reasonable observer who is informed of all the surrounding facts and circumstances" would be aware of the two-year time period in MCR 2.003(C)(1)(e), and would be aware that the trial judge's employment with defendant fell well outside that time period. *Id*. In fact, by holding otherwise, we would essentially render MCR 2.003(C)(1)(e) nugatory—in other words, because *any* previous employment with a party would be sufficient to raise the appearance of impropriety and thus require disqualification, the two-year period in MCR 2.003(C)(1)(e) would be meaningless. We decline to adopt such an interpretation of the court rule. See *Casa Bella Landscaping, LLC v Lee*, 315 Mich App 506, 510; 890 NW2d 875 (2016) ("Court rules, like statutes, must be read to give every word effect and to avoid an interpretation that would render any part of the [court rule] surplusage or nugatory") (quotation marks and citation omitted).

Plaintiff has not shown that anything beyond the bare fact of the trial judge's previous employment with defendant raised the appearance of impropriety. Plaintiff argues that the trial judge's "insistence" on hearing the case was out-of-the-ordinary and demonstrated the risk of an appearance of impropriety. We disagree. The record is devoid of evidence that the trial judge in any way "insisted" on hearing this case, apart from the mere fact that he denied plaintiff's request for disqualification. Plaintiff does not explain how the trial judge had any interest one way or another in the outcome of the case. Plaintiff's assertion that the trial judge was "placed in a *very uncomfortable position* when he was assigned to be the trier of fact in this case against McKeen & Associates" is similarly unexplained.[4]

Plaintiff also has not supported her contention that the trial judge had a "personal relationship" with defendant. For the reasons noted, the mere fact of a judge's prior employment with a firm nearly a decade prior does not establish a disqualifying personal relationship with that firm. We conclude that the circumstances of this case do not give rise to an appearance of impropriety requiring the trial judge's disqualification.

Nor has plaintiff demonstrated actual bias or the serious risk of actual bias. See MCR 2.003(C)(1)(a), (b). See *Cain v Dep't of Corrections*, 451 Mich 470, 495 (1996). "[T]he party who challenges a judge on the basis of bias or prejudice must overcome a heavy presumption of judicial impartiality." *Id*. at 497. Neither the trial judge's previous employment with defendant, nor his denial of plaintiff's request for recusal, nor his ultimate decision in favor of defendant demonstrate actual bias. Judicial rulings, even if unfavorable to a party, do not demonstrate bias or prejudice unless they "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 496, quoting *Liteky v United States*, 510 US 540, 555; 114 S. Ct. 1147; 127 L Ed 2d 474 (1994).

Plaintiff also argues that, notwithstanding the court rule, the trial judge's denial of her request for recusal was a violation of her right to due process, citing *Crampton v Dep't of State*, 395 Mich 347, 351; 235 NW2d 352 (1975). The Due Process Clause of the United States Constitution "requires an unbiased and impartial decisionmaker." *Cain*, 451 Mich at 497. "[W]here the requirement of showing actual bias or prejudice under [the court rule] has not been met, or where the court rule is otherwise inapplicable, parties have pursued disqualification on the basis of the due process impartiality requirement." *Id.* Although *Crampton* is "the leading Michigan case addressing the constitutional basis for disqualification," plaintiff has failed to properly apply *Crampton* to the facts of this case. Our Supreme Court held in *Crampton* that a showing of actual bias is not necessary when "experience teaches that the probability of actual bias . . . is too high to be constitutionally tolerable." *Crampton*, 395 Mich at 351. Certain situations have been identified as posing such a risk, such as "where the judge or decisionmaker (1) has a pecuniary interest in the outcome; (2) has been the target of personal abuse or criticism from the party before him; (3) is enmeshed in [other] matters involving petitioner . . .; or (4) might have

---

[4] For the same reasons, to the extent plaintiff argues that the trial judge's "insistence" on hearing the case demonstrates actual bias or a serious risk of actual bias, that argument is meritless. See MCR 2.003(C)(1)(a), (b); see also *Cain v Dep't of Corrections*, 451 Mich 470, 495 (1996).

prejudged the case because of prior participation as an accuser, investigator, fact finder or initial decisionmaker." *Crampton*, 395 Mich. at 351 (quotation marks and citations omitted).

None of the circumstances identified in *Crampton* is present here. Although plaintiff implies that the trial judge in this case has some pecuniary interest in the outcome of this trial, the record does not support such a finding. Regardless of whether the trial judge and defendant may have once "made a lot of money for one another," plaintiff does not explain how the trial judge would stand to gain from a victory by defendant in *this* case. The trial judge's brief employment with defendant ended approximately ten years ago. Plaintiff has not presented any evidence that the trial judge had any ongoing interest in the firm's success or financial well-being.

Further, there is no evidence to suggest that the trial judge has been the target of personal abuse or criticism from either party. *Crampton*, 395 Mich at 351. And there is no evidence to suggest that the trial judge was "enmeshed" in other matters involving either party, and certainly not since his employment there ten years prior. *Id*. Finally, the trial judge had no prior participation in this case, either as an employee of defendant or otherwise. *Id*.

On the whole, we conclude that, because the trial judge satisfied the requirements set forth in MCR 2.003 and the Code of Judicial Conduct, and plaintiff has not established that the trial judge's participation in this matter would result in either actual (or a constitutionally intolerable risk of) bias or an appearance of impropriety, the trial judge's denial of plaintiff's recusal request did not constitute an abuse of discretion. *Roscoe*, 303 Mich App at 647.

## III. MOTION FOR INVOLUNTARY DISMISSAL

Plaintiff further argues that the trial court erred by granting defendant's motion for involuntary dismissal on the ground that Dr. Arbit's testimony had not established proximate cause. We disagree. In considering a motion for involuntary dismissal under MCR 2.504(B)(2) after a bench trial, we review de novo issues of law, and review for clear error the trial court's findings of fact. *Sands Appliance Services, Inc v Wilson*, 463 Mich 231, 235-236 n 2, 238; 615 NW2d 241 (2000). A motion for involuntary dismissal should be granted if, after the presentation of the plaintiff's evidence, the trial court determines that "on the facts and the law, the plaintiff has no right to relief." MCR 2.504(B)(2).

The elements of a legal malpractice claim are: "(1) the existence of an attorney-client relationship; (2) negligence in the legal representation of the plaintiff; (3) that the negligence was the proximate cause of an injury; and (4) the fact and extent of the injury alleged." *Charles Reinhart Co v Winiemko*, 444 Mich 579, 586; 513 NW2d 773 (1994) (citation omitted). Regarding proximate cause, "a plaintiff in a legal malpractice action must establish that the defendant's action was a cause in fact of the claimed injury." *Id*. In other words, a plaintiff pursuing a legal malpractice claim "is faced with the difficult task of proving two cases within a single proceeding." *Id*. (citation omitted). "To hold otherwise would permit a jury to find a defendant liable on the basis of speculation and conjecture." *Id*.

The elements of a medical malpractice claim are "(1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries

were the proximate result of the defendant's breach of the applicable standard of care." *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). The element of proximate cause encompasses both cause-in-fact ("but for" cause) and legal cause. *Id.* Proximate cause must be proven by a "more probable than not" standard; however, a plaintiff need not prove that the defendant's negligence was the sole cause of his or her injuries. *Id.* at 87. In a medical malpractice case, "[e]xpert testimony is essential to establish a causal link between the alleged negligence and the alleged injury." *Pennington v Longabaugh*, 271 Mich App 101, 104 (2006). This testimony must draw "a causal connection between the defendant's breach of the applicable standard of care and the plaintiff's injuries." *Craig*, 471 Mich at 90. An "expert opinion based upon only hypothetical situations is not enough to demonstrate a legitimate causal connection between a defect and an injury." *Skinner,* 445 Mich at 173. A plaintiff must establish causation by setting forth "specific facts that would support a reasonable inference of a logical sequence of cause and effect." *Id.* at 174. When the connection between the defendant's conduct and the plaintiff's injuries is entirely speculative or merely a possibility, plaintiff cannot establish proximate cause. *Craig*, 471 Mich at 93.

The record shows that Dr. Arbit's proximate cause opinion was based upon multiple layers of assumption and speculation. Dr. Arbit first assumed that the injury to plaintiff's mouth was caused by her pharynx being scraped by the laryngoscope because "something happened in her mouth that caused it to bleed" and he believed that the medical providers "would have seen" if the blood was from her lips or gums. He admitted that there were several ways that a few drops of blood could be found in the airway and that no particular injury to plaintiff's mouth or throat was recorded that day. He also admitted that "[t]he dentist said that this could have happened b[r]ushing her teeth or chewing a nut," but asked "what is more likely for her to do it biting on a nut, and she never felt it, never knew it. Or is it more likely to happen when someone put a metal instrument in her mouth that scraped it and we have blood, and a week later she's complaining of pain [?]." Dr. Arbit essentially conjectured that plaintiff's injury was caused by a laryngoscope scrape, based on little more than his "common sense" belief that it was "most likely." See *Skinner,* 445 Mich at 174.

Having speculated as to the cause of the injury, Dr. Arbit then further speculated that, had the defendants in the medical malpractice action noticed the injury, and immediately treated it with a dental consultation and antibiotic mouthwash, "it is very possible some of this would not have happened." The trial court correctly noted that this statement was speculative and imprecise, and that a mere possibility did not suffice to establish proximate cause. *Craig*, 471 Mich at 93. Although plaintiff argues that the trial court ignored other statements from Dr. Arbit that supported his opinion, the portion of Dr. Arbit's deposition cited by plaintiff does not support that argument. Dr. Arbit described the course of plaintiff's injury and treatment in the weeks following her surgery. When he finished, plaintiff's counsel asked him "Does this make sense that this related to scraping her gum, inserting the tube?," to which Dr. Arbit answered, "Yes. Hundred percent." Plaintiff's counsel then asked if Dr. Arbit felt "that's what happened here?." to which Dr. Arbit again responded, "Yes." These statements amount to little more than restatements of Dr. Arbit's opinion; they did not alter the opinion's essentially speculative nature. *Skinner,* 445 Mich at 174.

We conclude that the trial court did not err by granting defendant's motion for involuntary dismissal. *Sands*, 463 Mich at 235-236 n 2, 238. Having failed to establish proximate causation through expert testimony, *Pennington*, 271 Mich App at 104, plaintiff could not prove that, but for

-11-

defendant's allegedly negligent representation, she would have prevailed in the underlying medical malpractice case, *Charles Reinhart Co*, 444 Mich at 586.

Affirmed.

//s/ David H. Sawyer
/s/ Mark T. Boonstra
/s/ Michelle M. Rick